## Samuel Jines, Plaintiff-Appellee, v. The Greyhound Corporation, Defendant-Appellant.

### Gen. No. 48,962.

First District, First Division.

February 3, 1964.

Rehearing denied March 3, 1964.

Earle C. Hurley, Hayes, Kennedy, Ryan, Condon & Livingston, and Louis P. Miller, all of Chicago, for appellant.

Philip H. Corboy, of Chicago, and Alfred Y. Kirkland, of Elgin, for appellee.

MR. PRESIDING JUSTICE MURPHY delivered the opinion of the court.

This is a personal injury action in which plaintiff was awarded a $400,000 verdict and judgment. Defendant appeals on the theory that, as a matter of law, the evidence failed to prove plaintiff's due care or defendant's negligence. Defendant also complains of prejudicial trial errors, and that the verdict is excessive.

As to the occurrence, the evidence shows that on the evening of March 16, 1961, at about 10:30, plaintiff was in a disabled and stalled automobile when it was struck from the rear by defendant's bus. The automobile was knocked off the road; its gas tank caught on fire; and the interior of the car was badly damaged.

Plaintiff, together with his elder brother, Harry, his younger brother, James, and a friend, Dennis McKiness, had gone for a ride in an automobile purchased two days before by James for $62.50. It was a clear, cold night, and the roads were dry. After riding in the vicinity of St. Charles, they started to return to Elgin, their home.

At about 10:30, the motor stopped while they were driving east toward Elgin on U.S. 20, a straight blacktop road, 24 feet in width, with a black and white line extended, dividing the highway into two opposing traffic lanes. The former owner of the car, traveling east on U.S. 20 in another car, saw the disabled car and tried to start it. Not being successful, he pushed the car for about three miles, but the motor would not start, and he finally left them. Another driver came along and pushed the disabled car for a distance of one-half or three-quarters of a mile, and again the motor would not start, so he also left. The disabled car came to a stop and remained in the middle of the eastbound lane of U.S. 20. Two of its occupants testi-

fied they tried to push the car onto the shoulder of the road but couldn't move it.

The events immediately preceding the collision are in dispute. Defendant's bus driver testified he saw no lights on the stalled car. A truck driver, who was proceeding east on U.S. 20, some distance ahead of the bus, saw the car in the eastbound lane when he was about 150 feet distant. He testified he saw no taillights, no flares, nor anyone in the road flagging traffic. He turned into the westbound lane and passed the stalled car.

Two of the occupants of the car, Harry Jines and Dennis McKiness, were not called to testify. Plaintiff, Samuel Jines, and James Jines, the car owner, testified as to flagging oncoming eastbound traffic from the rear of the car; also, that the headlights and rear lights were on during that time and at all times prior to the collision. James said that he was flashing the lights from bright to dim, and that he was given a flare by a passing truck driver, with which he waved traffic and then "stuck it" in the center line of the highway, about 25 feet behind the car.

James further testified, "When I got the flare, my two brothers and Dennis were beside my car to the right. After the flare was lit awhile, then they got back in the car. When they got back in the flare was on, and the headlights were on. The tail lights were on. After they got back in the car when the flare was out on the ground I was flagging traffic. Traffic went around my car when I was out there alone. The flare burned out after the boys were back in the car awhile. I didn't tell anybody in the car that the flare had burned out. They didn't get out after the flare had burned out. . . . None of these cars stopped. They went around my car after the flare was out, about three, I would say. . . . After these cars went by then I saw this big object coming. It was a good distance

away, either a half mile or—He had his lights on. As he gradually came on, getting closer, I was going to flag him, and when he got within a hundred feet I heard tires screeching, . . . I yelled to my brothers and the McKiness boy, 'Hey, he's not going to stop.' . . . He was in the eastbound lane when I heard it. When I heard the screech of wheels I just had enough time to run to the shoulder and get out of the way. I ran to the right shoulder, on the south side, the same side of the street that the car was on. Then the bus just ran right into the back of my car. . . . At the time that the bus hit the rear end of my car, the tail lights were on. The flare was out."

Plaintiff testified that after flagging for awhile, he, Harry, and McKiness got back into the car. His purpose in re-entering the car was to dry his legs and to get a flashlight. This was two to five minutes before the occurrence. He was sitting in the back seat of the car and noticed headlights on the inside of the car and heard his brother yell, "It isn't going to stop." He looked back and saw the big windows and the lights, and the collision occurred.

The bus driver testified that he was en route from Rockford to Chicago, traveling at a rate of 45 miles per hour in a 50-mile zone. He had his depressed or dim headlights on, which cast a beam out in front for about 200 feet. When he was about 150 feet away, he saw something on the road, which turned out to be an automobile in the eastbound lane, without lights. He immediately applied his service brake and started to slow down and attempted to turn to the left to pass around the stalled vehicle. As he started to make his turn he saw a person near the rear of the car moving across the left-hand or westbound lane. Rather than run this person down, he turned back into the eastbound lane and collided with the stalled automobile

at a speed of 15 to 20 miles an hour. His tires left 78 feet of skidmarks west of the point of collision.

As to damages, the evidence shows that plaintiff was then 21 years old, in good health before the collision, married and the father of two children. He had quit school after the ninth grade, but secured a high school diploma while in the army. He had spent a short time in jail for burglary. He was unemployed at the time of the occurrence, but during the preceding year he had earned about $1,150.

The medical testimony as to plaintiff's injuries is not disputed, and it is admitted that his physical condition is permanent. Plaintiff is now a quadriplegic— all four extremities are paralyzed. A "fracture dislocation" had occurred (one vertebra slides forward on another) and "obviously the spinal cord is injured." From a functional viewpoint, it was a transected spinal cord, which resulted "in almost complete paralysis of the upper extremities, and a complete paralysis of the trunk and lower extremities. . . . The functions of the bladder and bowel and the private parts of a person are controlled by the spinal cord. In this case this transected spinal cord had the effect of a complete loss of control. He lost control of his bladder and bowels."

A urologist testified that in his opinion "a man in Mr. Jines' condition, restricted to the urological condition, is more susceptible to body infection than is a person who does not have the urological condition, because the patient is at flat bed rest, for one thing, and the muscles don't have the normal tonus or function that they normally do, and he lies more or less as a vegetable and functions just automatically. . . . This urinary condition and his inability to voluntarily urinate is permanent. His inability to empty his bowel is permanent."

369

Plaintiff remained in the hospital six months. He was also treated at the Rehabilitation Institute of Chicago. A specialist in rehabilitation and physical medicine testified that at the time the plaintiff was discharged from the Institute, he was "rehabilitated to his optimum physical potential. . . . He might learn a few minor things still to do by doing and as time goes on, but basically he has learned those things which can be expected of him. . . ." He can reasonably be expected to live out his life expectancy if given the proper care.

As to his daily life, an orderly must dress him; sponges are placed on the wheelchair to alleviate the pressure which creates sores on his body; he must be served at the dinner table; he is given exercises of a completely passive nature three times a day; he is bathed by attendants twice a week and receives daily sponge baths and alcohol rubs three or four times a day in addition to his medication; he takes a sedative every night and a suppository every morning; each day he is under constant observation for marked depression; he receives bladder irrigation twice daily under sterile procedures; if he is not changed frequently, he develops bed sores; a Foley catheter that he constantly wears is held in place by a balloon blown up inside the bladder; the catheter drains the urine off the bladder, then through the catheter to a bag attached to his leg. As to the use of his body, he can "feel hardly anything" below the level of his chest. He cannot use his hands to any significant extent and cannot open his hands by himself or voluntarily use his fingers. The cupped position of his hands is a characteristic of quadriplegia. The only way he can move his legs is by pushing them with his hands and arms. He will never walk again, and he is extremely depressed. He cannot voluntarily bend his body from the waist, either forward or backward.

His bowel movements are controlled by lubrication, stimulation and manual extraction of impacted material. He will require the use of a catheter for urination for the rest of his life. His condition requires permanent care, and he must remain in a sanitarium for the rest of his life, and in the most sterile conditions, because the tube from the catheter must be inserted a considerable distance into the body.

At the time of the trial, plaintiff's life expectancy was 47.68 years. The evidence shows that the present reasonable charge for sanitarium care of plaintiff is about $6,000 a year. His medical expenses incurred to the time of the trial amounted to $16,000.

Defendant's contentions have been scrutinized closely and carefully. The issues are considered in what we believe to be the logical sequence.

Initially, we consider the principal defense of contributory negligence or lack of due care by plaintiff. Defendant has contended throughout the proceedings that "if a person is in a position of safety and abandons it to go into a position of danger, his conduct is such that contributory negligence should be imputed to him." The jury answered "Yes" to defendant's special interrogatory, "Was the plaintiff, Samuel Jines, in the exercise of ordinary care for his own safety at and immediately prior to time of the occurrence in question?"

Defendant cites numerous cases to support this point, principally Illinois Cent. R. Co. v. Oswald, 338 Ill 270, 170 NE 247 (1930). In that case, the plaintiff was a passenger in an automobile going over an overhead bridge; a locomotive operated by defendant was standing beneath the bridge emitting a dense cloud of smoke; the car in which plaintiff was riding stopped short of the smoke and stood, waiting for it to clear; the wind shifted, and the smoke drifted over plaintiff's car; another car came up from the rear and

struck plaintiff's car; she got out and walked back on the sidewalk to the rear of her car, where she stepped into the street to examine the damage; while there, another car struck the rear of the last car in line, and plaintiff was injured. In holding that the trial court erred in not directing a verdict for the defendant, the Supreme Court said (p 274):

"In the absence of willful or wanton injury on the part of the defendant the plaintiff cannot recover in an action for personal injuries unless it appears he was in the exercise of ordinary care for his safety, and in such case it is the duty of the court to direct a verdict for the defendant if there is no evidence tending to show affirmatively that the plaintiff was exercising due care or to raise a reasonable inference of such care. A party has no right to knowingly expose himself to danger and then recover damages for an injury which he might have avoided by the use of reasonable precaution. Although it is true that the question of contributory negligence is ordinarily a question of fact for the jury, yet when there is no conflict in the evidence and the court can clearly see that the injury was the result of the negligence of the party injured, it should not hesitate to instruct the jury to return a verdict for the defendant. . . . In the instant case there is no conflict in the testimony. According to defendant in error's own testimony she left a place of safety upon the sidewalk, and, as she styled it, 'carelessly' went into a dangerous place, knowing the danger of such a course, 'without thinking about it.' The record is entirely devoid of any evidence showing or tending to show any act on the part of defendant in error which might prove, or tend to prove, any exercise of ordinary care or any attempt on her part to use such care for her own safety."

The other Illinois cases cited by defendant are similar to the Oswald case. In Little v. Illinois Terminal R. Co., 320 Ill App 163, 50 NE2d 123 (1943), it was undisputed that plaintiff had entered an area in which his "vision was so completely obliterated that he could not see the front end of his automobile" and (p 167) "[plaintiff] knew that under existing conditions, he could not see a car, if there should happen to be one there." In Walker v. McGregor, 40 Ill App2d 52, 189 NE2d 537 (1963), plaintiff was found guilty of contributory negligence, as a matter of law, since (p 55) "It is obvious that plaintiff knowingly exposed himself to an obvious danger and an almost inevitable accident."

We believe the foregoing situations are substantially different from the instant case. There is evidence in the record to show that when the plaintiff re-entered the car there was a lighted flare on the highway 25 feet behind the car; the car's taillights were lighted; the car was green with a white trunk and white top; his brother was standing 25 feet behind the car; visibility was good, and he could see 500 feet; he was aware that other vehicles (about eight) had encountered no difficulty in passing around the stopped car and a truck driver had stopped and given James a flare; the highway was straight and level; and there was adequate room on the 24-foot highway for a bus eight feet wide to pass on the left of the stopped vehicle.

■■ Considering the evidence, with all the reasonable inferences to be drawn therefrom, in its aspects most favorable to plaintiff, we are of the opinion that fair-minded men might honestly draw different conclusions as to whether plaintiff, before and at the time of the occurrence, was using ordinary care for his own safety. Therefore, we cannot say, as a matter of law, that the evidence in this case established contributory negligence or lack of due care on plaintiff's

part. (Hatcher v. New York Cent. R. Co., 17 Ill2d 587, 592, 162 NE2d 362 (1959); Swenson v. City of Rockford, 9 Ill2d 122, 127, 136 NE2d 777 (1956).) This was a question of fact for the jury.

We next consider the contention that plaintiff failed to prove the defendant guilty of negligence. The bus was in good mechanical condition, and the lights were operating with a depressed or dimmed beam; the driver had normal vision and could see about 200 feet ahead; when he was about 150 feet away he caught sight, for the first time, of the car in the road; he was traveling about 45 miles an hour in an area where the speed limit was 50 miles an hour; also, it is admitted there was no flare in back of the stalled car at the time of the collision. Defendant asserts that the driver was confronted with an emergency, not of his own making, and for which he was not responsible, and that he immediately applied his brakes, started to slow down, and turned toward the left to go around the disabled vehicle. As he swerved, he saw a person near the rear of the car, crossing the left-hand lane. To avoid running him down, he turned back into the right-hand lane, applied his brakes harder, and skidded a distance of 78 feet into the rear of the car.

Plaintiff has cited cases to show that the driver of an automobile is bound to keep a continuous lookout while driving his car on a paved highway, especially after dark. (Secrist v. Raffleson, 326 Ill App 489, 62 NE2d 36 (1945); Conner v. McGrew, 32 Ill App2d 214, 177 NE2d 417 (1961).) In Paul v. Garman, 310 Ill App 447, 34 NE2d 884 (1941), it is said:

> "It is the duty of an operator of an automobile to keep a lookout for vehicles standing in a highway . . . . And when approaching such vehicle it is the duty of the operator of an automobile to

observe whether there are any persons about the vehicle, and use reasonable care to avoid injuring them."

▮ Defendant argues that due to the presence of a person on the highway the negligence question should be phrased, "What, then, would a reasonably prudent man do, confronted with this emergency? Would he have run down the pedestrian, would he have collided with the car, or would he have upset his bus in the ditch?" In Rzeszewski v. Barth, 324 Ill App 345, 354, 58 NE2d 269 (1944), this test was stated by the court:

> "Persons who have to act in a sudden emergency are not to be judged in light of after events, but are to be judged, under all the circumstances of the case, by the standard of what a prudent person would have been likely to do under similar circumstances. . . . Where a person must act in an emergency it is for the jury to say whether he acted with that care and foresight which a reasonably careful and prudent driver would use in like circumstances."

However, the emergency rule is not effective unless defendant can show that he was in the exercise of due care preceding the occurrence. Hawbaker v. Danner, 226 F2d 843, 848 (1955).

We believe fair-minded men might differ as to what the bus driver should have done. A reasonably prudent man, seeing a stalled vehicle at 10:30 at night, on a fairly heavily traveled highway, might think the exercise of ordinary care would require stopping the bus before proceeding around the stalled car, in order to avoid striking any person in the immediate vicinity whose presence might reasonably be expected; others may think the bus driver, before proceeding

around the car, should have reduced his speed below the admitted collision speed of "15 to 20 miles an hour," keeping a sufficient lookout ahead, so as to be able to stop the bus in time to avoid a collision with the the stalled car or to avoid hitting any pedestrian in the vicinity. We also note that there is no corroboration of the bus driver's testimony that he saw a person near the rear of the car, crossing the left-hand lane. James Jines testified that when he saw the bus was not going to stop, he ran to the right shoulder on the south side of the road, which was the same side of the highway as the stalled car. We believe the question of defendant's negligence was properly submitted to the jury.

We conclude that defendant does not show, as a matter of law, a total failure to prove plaintiff's due care or defendant's negligence, or that this verdict is contrary to the manifest weight of the evidence. This is not a case in which an opposite conclusion to that of the jury is clearly evident, as is required before this court can disturb the verdict. Kinney v. Kraml Dairy, Inc., 20 Ill App2d 531, 538, 156 NE2d 623 (1959).

Defendant also complains of "serious and prejudicial trial errors," which included "circumscribing defendant's examination of jurors on the voir dire, and in permitting the plaintiff to indoctrinate them to a verdict of $500,000." Defendant unsuccessfully sought to inquire whether the jurors "would require the plaintiff to prove that his injury occurred through no fault of his own." In People v. Lobb, 17 Ill2d 287, 300, 161 NE2d 325 (1959), our Supreme Court said:

"This court has also recognized that the scope and extent of the voir dire examination rests within the discretion of the court and is subject to reasonable limitation. . . . It has never been

376

suggested that a reasonable limitation on voir dire examination operates to deprive a litigant of his right to a jury trial. However, a failure to permit pertinent inquiries to enable a party to ascertain whether the minds of the jurors are free from bias or prejudice which would constitute a basis of challenge for cause, or which would enable him to exercise his right of peremptory challenge intelligently, may constitute reversible error."

The question of bias or prejudice in this area was adequately covered by other answered questions. In the light of Supreme Court Rule 24-1, we find no unreasonable limitation of defendant's examination of jurors. As to voir dire questions concerning the amount of the verdict sought, reasonable latitude should be given because, as said in Murphy v. Lindahl, 24 Ill App2d 461, 470, 165 NE2d 340 (1960):

"Some prospective jurors may have had fixed opinions, which indicate bias or prejudice against large verdicts, and which might not readily yield to proper evidence."

We find no abuse of discretion in the voir dire examination of jurors.

■■■ As to the admission of evidence, defendant contends the court committed error in admitting testimony to show "that the reason the disabled car was left on the highway instead of being pushed off to the side, was that its left rear wheel 'froze' and became inoperative, and it could not be pushed." The brake drum was not offered in evidence, and its absence was not accounted for by plaintiff. The testimony that the left rear wheel was "froze solid" was based on an examination of the wheel on May 15, 1961, about two months after the occurrence. It is admitted that the

car was a total wreck and never operable after the collision. The record includes testimony as to the care and custody of the wrecked car for the period in question, and the witness, an experienced automobile mechanic, testified as to his examination of the brake drum and gave an opinion that the faulty brake drum could have locked after being pushed, preventing manual pushing of the car. We have examined Paul Harris Furniture Co. v. Morse, 10 Ill2d 28, 139 NE2d 275 (1956), and do not find it to be persuasive on this point. There the court found no evidence to support an inference as to prior condition of the property in question, while the case at bar contains testimony which can support such inference. We find no abuse of the court's discretion. The failure of plaintiff to produce the brake drum, defendant argues, violated the best evidence rule. The rule is not applicable here because it applies only to documentary evidence. (Steward v. Bartley, 5 Ill App2d 208, 213, 124 NE2d 899 (1955); Cleary, Handbook of Illinois Evidence 131 (1956).) Other than to observe the court exercised a liberal use of discretion in this area of evidence, we find no error here.

■■ Defendant also complains that plaintiff's attorney "was guilty of prejudicial and inflammatory conduct both in his examination of the witnesses and during defendant's examination"; also, that the court erred in instructing the jury by refusing two instructions tendered by defendant. We find no prejudicial or reversible error in either contention, and specific discussion of the points would unnecessarily extend this opinion. All parties to the trial were represented by competent and experienced trial counsel, and the instructions given to the jury were sufficient and adequate to inform the jury of the legal issues and the fact determinations to be made.

■ Of defendant's contentions, we believe the paramount issue is whether "the $400,000 damages awarded in this case are so excessive that they can only be accounted for on the ground of bias and prejudice." Defendant admits that plaintiff sustained serious injuries and argues that "the amount of the verdict goes far beyond the limits of the compensation, and enters the punitive field." Initially, on this point we agree with defendant that "the way the amounts awarded in verdicts in personal injury cases have been rapidly increasing is a matter of concern to all who are interested in a fair and orderly administration of justice" (Wetherbee v. Elgin, J. & E. Ry. Co., 191 F2d 302, 309 (1951)), and that an award for past and future pain and suffering that "shocks the conscience" should not stand. We are aware, also, that a court of review has the "power to examine the whole case on the law and the evidence, with a view to securing a result, not merely legal, but also not manifestly against justice,—a power exercised in pursuance of a sound judicial discretion, *without which the jury system would be a capricious and intolerable tyranny,* which no people could long endure." Aetna Casualty & Surety Co. v. Yeatts, 122 F2d 350, 353 (1941).

The Illinois cases cited by defendant on the question of damages are Goertz v. Chicago & N. W. Ry. Co., 19 Ill App2d 261, 153 NE2d 486 (1958); Pitrowski v. New York, Chicago & St. L. R. Co., 6 Ill App2d 495, 128 NE2d 577 (1955); Walker v. Martin, 43 Ill 508 (1867); and Loewenthal v. Streng, 90 Ill 74 (1878). Of these authorities, defendant relies heavily on the Goertz case, where this Division ordered a remittitur from $300,000 to $200,000. In that case, the plaintiff was 61 years of age, with a life expectancy of twelve years. As a result of the occurrence he suffered the amputation of his left arm nine inches above the elbow

379

and both legs ten inches below the groin. He was fitted with artificial legs and an artificial appliance for his left arm and spent practically all of his time in a wheelchair. He slept fitfully and experienced painful sensations from his limb loss. In arriving at the conclusion that the verdict was "clearly excessive," the majority opinion cited comparable verdicts and, in each instance, in addition to describing the injuries, noted the life expectancy of each plaintiff. Justice Kiley in his concurring opinion (p 275) said:

> "It might also be said that it is fruitless to search for any norm to measure compensation for intangible painful consequences of a wrongful injury. On the other hand there must be a norm, otherwise how can the rule state that a verdict may not be set aside as excessive unless it be 'wholly unwarranted,' 'palpably excessive' and so on. The very words used in the rule presuppose a norm. There is no evidence upon which the jury can decide because there is no evidence in any record itself which tells the jury how to go about deciding how much to allow for intangibles and therefore the range of the verdict would be limitless.
>
> "But everyone admits there must be a limit. . . .
>
> "The test is limited to the question of the *fairness* of the award for the intangibles, since there is evidence of plaintiff's special and intangible injuries in the record and no controversy at the trial about them.
>
> "The operable rules are clear. The assessment of damages is the pre-eminent function of the jury. Kahn v. James Burton Co., 5 Ill2d 614, and their verdicts based on their assessments must not be set aside unless clearly the result of passion and prejudice. Barango v. Hedstrom Coal Co., 12

380

Ill App2d 118. The purpose of the award of damages is to repair plaintiff's injury or make him whole as nearly as that may be done by money. Harper and James, The Law of Torts, p 1301. There appears to be no precise standard by which to accurately define compensation due to a person for the intangible consequences of wrongful injury. The answer is not to give 'the sum which the plaintiff, or anyone else, would be willing to suffer the injury for.' Harper and James, ibid., p 1322. Also the award should be measured by what is due the plaintiff and not by what the defendant is able to pay. (Oleck, Damages to Persons and Property, p 155, 1955 Ed.)"

And, on page 277, in discussing intangibles, it is said:

"A study of the Illinois cases, cases from other jurisdictions and federal cases cited in the briefs on the question of excessiveness shows an average allowance for pain and suffering of less than 50% of the total verdict. The revelant Illinois cases show an average allowance of about 40% of the total verdict."

Defendant argues that the standard set forth in the concurring opinion of Justice Kiley can be usefully applied here. Defendant capitalizes plaintiff's special damages at 4½% and projects a total of about $119,000. To this, defendant adds $16,000 medical expenses already incurred, and arrives at a total of $135,000 for plaintiff's special damages, leaving the remaining $265,000, of the $400,000 verdict, for the intangibles of pain and suffering. Defendant maintains that results in an allowance of two-thirds of the verdict for pain and suffering, and measured by the statement in the Goertz case that the "revelant Illinois cases show

an average allowance of about 40% of the total verdict," the present verdict is excessive in an amount of about $105,000.

Plaintiff, using the same premise, contends "the reduced verdict gave Goertz $10,833 per year for the same period," and if that method of calculation were applied to the instant case, the "average annual allotment for intangibles for 47.68 years, Samuel Jines' life expectancy," is $5,558. Plaintiff also notes that his future medical expenses would conceivably arise if there were need for combative medical treatment. Plaintiff also disputes defendant's projection of plaintiff's future earnings at $1,000 a year, even though "the chances of a man with a criminal record obtaining and retaining lucrative employment are not good."

As to the other Illinois cases cited by defendant, the Pitrowski case was a death action brought under the Federal Employers' Liability Act, and the court said (p 502):

> "The damages should be the pecuniary loss suffered by the plaintiff. . . . The jury were properly instructed that they should return a verdict which would adequately compensate the widow and surviving children for the pecuniary loss sustained on account of decedent's death."

In the Walker case, the Supreme Court reversed a $20,000 verdict in a malicious prosecution suit on the ground that the jury did not seem to take into account the character of plaintiff.

In the Loewenthal case, the court found the verdict to be "so flagrantly excessive as to be only accounted for on the grounds of prejudice, passion or misconception . . . ."

To justify the amount of the verdict, plaintiff cites numerous Illinois cases which we find unnecessary to discuss in detail. In point is Lau v. West Towns Bus

Co., 16 Ill2d 442, 158 NE2d 63 (1959), where the jury returned a $75,000 verdict with a record of special damages of $1,500. In that case, the court said (p 452):

> "It is true that the verdict is large in comparison to the expenses of plaintiff, but we cannot limit compensable damages for pain and suffering to a set percentage of medical, hospital and kindred expenses. Costly surgery may result in complete recovery for one person, while the total of the foregoing expenses incurred by a multiple amputee may be small. Each verdict for a personal injury must be examined in the light of the particular injury involved, with humble deference to the discretion of the jury in making its determination and to the ruling of the trial judge on the post-trial motions. Johnson v. Eckberg, 94 Ill App 635."

In Hulke v. International Mfg. Co., 14 Ill App2d 5, 142 NE2d 717 (1957), the court permitted a $300,000 verdict to stand, which had been awarded to a 31-year-old plaintiff, who suffered severe and extensive burns, saying (p 49):

> "The amount of damages is primarily a question of fact for the jury to determine. The court has no right to substitute its judgment for that of the jury."

In Murphy v. Lindahl, 24 Ill App2d 461, 165 NE2d 340, this Division refused to disturb a $250,000 verdict awarded to a 51-year-old plaintiff with a life expectancy of twenty-two years, who had suffered the loss of his left leg, with brain damage and lung injuries which "might or could be permanent." We there said (p 472):

> "Plaintiff was entitled to substantial damages and reasonable men might differ as to the amount.

. . . we find no basis to depart from the usual rule that the assessment of damages is the pre-eminent function of the jury. . . . Considering plaintiff's expenditures, past and future, lost wages, pain and suffering, and his life expectancy, we think the verdict is within the reasonable scope of the evidence and is not so clearly excessive as to require this court to disturb it."

Further considering the verdict, we find no merit in defendant's contention that plaintiff cannot reasonably be expected to live out his life expectancy, because he is subject to repeated attacks of urinary infection. This is conjecture and speculation. Also, we find no merit in the contention of "bias and prejudice." Plaintiff's background was fully exposed to the jury, and if any bias or prejudice was developed, it may have been directed against him rather than for him. As to the question of passion and sympathy entering into the verdict, we believe it a reasonable inference that plaintiff's physical plight undoubtedly aroused a normal sympathetic reaction on the part of the jury, but we find nothing in the record to show that his physical condition was improperly used to arouse the passion and sympathy of the jury.

After serious examination of the question of excessiveness, and after considering the verdict in the light of plaintiff's permanent physical injuries and his life expectancy, we have come to the conclusion that, although the amount of the instant verdict is high, it is not clearly excessive, and we find nothing in this record to warrant our disturbing it.

We conclude the instant trial was free from prejudicial trial errors, and for the reasons stated the judgment is affirmed.

Affirmed.

BURMAN and KLUCZYNSKI, JJ., concur.