ILLINOIS BELL TELEPHONE COMPANY, Plaintiff and Counterdefend-ant-Appellee and Cross-Appellant, v. THE CITY OF HIGHLAND PARK, Defendant and Counterplaintiff-Appellant and Cross-Appellee.

Second District   No. 2—90—0663

Opinion filed May 30, 1991.—Rehearing denied June 27, 1991.

16

REINHARD, P.J., dissenting.

Michael F. Bonamarte III, of DeSanto & Bonamarte, P.C., of Waukegan, for appellant.

William P. Anderson, of Fuqua, Winter, Stiles & Anderson, Ltd., of Waukegan, for appellee.

JUSTICE McLAREN delivered the opinion of the court:

Defendant, the City of Highland Park (City), appeals from the judgment of the circuit court in favor of plaintiff, Illinois Bell Telephone Company (Bell), on Bell's negligence complaint. The City raises two issues on appeal: (1) whether the trial court's judgment was against the manifest weight of the evidence; and (2) whether a City ordinance granting plaintiff certain rights in the City bars it from maintaining its cause of action. Bell cross-appeals that part of the judgment which found it 40% comparatively negligent and awarded Bell $10,992.31. In its cross-appeal, Bell raises the following issues: (1) whether the trial court erred in finding that the City had not committed an intentional trespass; (2) whether, as a matter of law, the City cannot raise the defense of contributory negligence to an intentional trespass; (3) whether the trial court's finding that Bell was 40% comparatively negligent was against the manifest weight of the evidence. We affirm in part and remand.

Bell filed a two-count complaint in the circuit court against the City, alleging that on October 11, 1985, the City was performing construction work in the area of 1440 Oakwood in Highland Park. During the course of this construction, an underground Bell cable was damaged. Count I alleged that the City committed a trespass by performing construction at 1440 Oakwood without Bell's consent or knowledge. Count II alleged that the City was negligent because it failed to locate cables under the street and performed its excavation without regard for others' property; negligently augered under the street so as to damage Bell's equipment; disregarded paint and stakes locating Bell's equipment; and damaged Bell's equipment.

The City raised the affirmative defense of contributory negligence. The City alleged that it requested information from Bell regarding the location and identity of underground cables and Bell representatives did not tell the City that there were three ducts under the street.

The City also included a counterclaim for declaratory judgment. The City alleged that it enacted an ordinance granting Bell certain

rights in Highland Park. The City alleged, in relevant part, that section 4 of the ordinance provided:

> "The Company shall, at its own expense, defend all suits that may be brought against the Municipality on account of or in connection with the violation by the Company of any of the obligations hereby imposed upon or assumed by it, or by reason of or in connection with any damage to life, limb or property as a result of any of the structures constructed by it under or by virtue of this ordinance, and shall save and keep harmless the Municipality from any and all damages, judgments, costs and expenses of every kind, that may arise by reason thereof; provided, that notice in writing shall be immediately given to the Company of any claim or suit against the Municipality which, by the terms hereof, the Company shall be obligated to defend, or against which the Company has hereby agreed to save and keep harmless the Municipality and provided further that the Municipality shall furnish to the Company all information in its possession relating to said claim or suit, and cooperate with the company [*sic*] in the defense of said claim or suit. The governing body of the Municipality may, if it so desires, assist in defending any such claim or suit, but solely under the direction of the Company or its attorneys, and the Company shall not be required to reimburse the Municipality for expenses incurred by it in case of the election so to assist."

Based on this section, the City contended that the suit between the parties was not allowed and that Bell had implicitly waived its right to claim damage to its property caused by the City.

At the bench trial, Michael Becvar testified that he worked for Bell as a cable splicer. On October 11, 1985, his supervisor sent Becvar to 1440 Oakwood to repair the facility. When Becvar arrived on the scene, City employees had damaged a cable and were trying to dig it up to see what was the problem. According to Becvar, the cable was so badly damaged that it had to be replaced, rather than repaired. The damaged cable was a "1200 pair lead cable," which consisted of 1,200 wires surrounded by lead.

At 1440 Oakwood, Bell had three ducts between two manholes, but on October 11, 1985, Becvar was unaware that there were three of them. Becvar described the ducts as "a six-duct with two, two, and two; *** a nine-duct which is three by three, and another nine-duct, three by three." According to Becvar, the damaged cable was in the middle duct, which was one of the lower two ducts. On cross-examina-

tion, Becvar admitted that he was "not 100 percent positive" that the damaged cable had been laid in the duct system.

The court asked Becvar in which of the ducts was the damaged cable. Becvar responded that he was not sure because they could not get at the cable to repair it. The court also asked what the hole looked like. Becvar stated that there was a hole in the bottom part of a 2½- to 3-inch cable. In addition, Becvar explained that the ducts were encased in red clay tile, which was then covered with concrete. Becvar admitted that he did not know whether the damaged cable was protruding from an encasement of clay and concrete. Becvar further explained:

> "In the manhole you have a concrete wall. You can tell it's clay duct tile by looking inside of it, but it's a flush manhole wall, and you have your six-duct and a few inch spacing, then your nine-duct, and then your next nine-duct. It was a flat concrete wall."

According to Becvar, there are holes in the concrete for service access.

On redirect examination, Becvar indicated that it was not possible to tell from within the manhole whether the entire three-duct system was encased in concrete because of a separate wall on the inside of the manhole.

Steven Harlow, a locator for Bell, testified that, as a general practice, the JULIE system, a multiutility locating system, contacts Bell after it receives a request for Bell cable information. Harlow then goes to the site and refers to plat maps, which indicate what type of cable is placed in the ground and its general location. Harlow then uses a dynatel to locate physically the cable within six inches. Harlow then marks the spot with orange paint and orange stakes.

Harlow further testified that on the cable exchange map, which depicts the configuration of ducts, it was not apparent that there were three ducts at 1440 Oakwood. The map depicted the manholes and one duct run. Harlow does not locate the depths of ducts, and when there is more than one duct on top of each other, Harlow would mark that there was a duct system. Harlow admitted that Bell had knowledge of what they had underground.

Harlow had gone to locate cable at 1440 Oakwood at the City's request. He marked a double orange line and wrote "T/duct" to show the location of the telephone duct. Harlow went into the pit that the City employees had dug. Harlow shined a flashlight through a four- to six-inch hole in which copper tubing had already been placed. He saw where the workers had bored through and damaged a cable. The duct

markings ran parallel to the street, and the boring hole ran perpendicular to the street and intersected with the duct markings.

Stephen Nitschneider, a Bell engineer, testified regarding the age of various types of underground structures. According to Nitschneider, the damaged cable had been installed in the mid 1950's. Nitschneider also indicated that the configuration of three ducts stacked on top of each other was not uncommon in Highland Park. In response to a question posed by the court, Nitschneider explained that if there was a loose cable, not in a duct, the map would show the existence of such a cable. Nitschneider further clarified what the map showed, since the map did not depict the duct work itself. According to Nitschneider, if the cable "was outside of the duct work it would be outside of this manhole, it would be a line between the two manholes."

Jack Donald Wood, a safety manager for Bell, testified that he was Harlow's supervisor. Wood stated that Bell never marks the depth of its cables or ducts because the grade could change as much as three to four feet. Bell locators do not identify multiple structures which are located one on top of another; they merely mark the area as a duct or a cable. According to Wood, other utilities also do not mark for depth or multiple structures. Custom and practice in the industry is that the party augering must make sure that the auger's path is clear of any underground structures. Wood further testified that the type of cable which was damaged was always put in a duct, although he admitted that he was not sure that the damaged cable was in a duct system.

When Wood learned of a problem at 1440 Oakwood he went to the site and asked the workers whether they hit a cable. The workers did not know that had happened, since they thought their line was below Bell's structures. Wood described the area as two pits, one on either side of the orange markings. Wood got into one pit, which was about five feet deep. The City was putting the hole through to a "catch pit," where they would hook up the water line to the service to the house. Wood looked through the hole and saw the damaged cable next to copper tubing. Wood did not notice any artificial structures anywhere around the hole. Wood also could not see any Bell ducts on the walls of the pit as there was mud and clay. In Wood's opinion, the cost of repair to the cable, $18,320.52, was reasonable for the damage sustained.

Bell called John Shelton, a foreman of the water division for the City, as an adverse witness. Shelton was the foreman of the crew installing new water lines at 1440 Oakwood. Shelton explained that the

crew dug two pits, one on the east side of the street across from the house, and the other in the driveway of the house. To make the hole to the receiving pit, the crew used a hole auger, which Shelton described as similar to "a small ground torpedo," powered by compressed air. The sending pit was in the northbound lane of the street.

The crew used a rod and shovel to locate the Bell structures. Shelton stated that the locator only indicated that there was one duct, but the crew found two ducts. Shelton knew the auger hole was under those two ducts. The copper service line was placed five feet down, at the bottom of the pit.

With a rod that was four feet long and five-sixteenths of an inch thick, Shelton probed the area where the "hole hog" was to go through, prior to making the hole. The crew then sent the "hole hog" through. Shortly thereafter, someone from Bell came by and asked if they had hit a telephone line. Shelton did not know that they had. He thought the hole was below the lines. Shelton looked through the hole and saw the broken cable. Shelton stated that they never found a third duct, but one was located later, alongside the top duct. According to Shelton, the "hole hog" maintained its grade under the road and ended up where the crew intended it to go. The crew put the hole about one foot below the second duct. The broken cable was 18 inches from the wall of the receiving pit.

Shelton further testified that they thought there was only one duct. They found the second duct accidentally. They exposed the ducts with a shovel and then probed around underneath the second duct, but felt nothing. Shelton stated that he had never encountered a Bell structure five feet below grade. Other cables were at a depth of 18 inches to 2 feet.

The court asked Shelton whether Bell ever indicated there were multiple structures when the City was digging. Shelton responded:

"The phone company generally [does] not, they mark what is there, and what we normally do is dig down and expose what is telephone [sic]. Normally it's one cable, and that is what we find and locate, and then we will continue with our excavation."

Shelton assumed that, if there were multiple ducts, the locator would write the number of ducts, or would hold an on-site meeting to explain what was underground. Shelton had never before encountered duct work, although there are cables present in approximately half of the water department digs. The greatest depth at which Shelton had encountered a cable was three feet down.

Shelton found the first duct one foot under grade and exposed it. He probed underneath that duct and found the second duct. The two were separated by a four-inch layer of wood, and the whole thing was encased in concrete. Shelton probed down to determine how far down the concrete went, which was approximately three feet. They then probed the area where the "hole hog" was to go through.

At the close of Bell's case, the City made a motion for a directed verdict, which was denied. The City then recalled Shelton to testify. Shelton stated that duct systems are not prevalent throughout Highland Park because they are used for main lines which run cables between municipalities. When the crew uncovered the first duct, Shelton assumed it was one large duct. It was not until they had exposed it with a shovel that Shelton realized there were two separate ducts. Shelton probed into the wall of the receiving pit at the level where they were going to put the "hole hog." The crew probed in several places, at different heights from the bottom of the second duct past the grade where the hole would be, covering a 12- to 18-inch area.

All three ducts were uncovered after the cable was damaged. According to Shelton, the three ducts were not one on top of another, but were in an "L" shape, with two ducts side by side and the third on the bottom.

The court questioned Shelton about the probe. Although they probed the area where the auger subsequently hit the cable, the crew did not hit anything with their probe. As Shelton explained:

"[I]f it's a three-inch cable, we could have missed it; you know, by probing over it, under it. When you can't see into the ground some of this is luck of the draw, you know, you hope you hit everything in there. *** [I]f you hit something you are obligated or expected to expose it. Unfortunately, we didn't hit anything."

Shelton stated that they probed at the five-foot depth because they found a duct that they were not aware of, and it only took an extra five minutes to probe to see if there was anything else there.

Shelton took some pictures in the hole of a dig site at 1530 Oakwood, taken after the dig at 1440 Oakwood. In the hole was an exposed cable. Shelton testified that he never saw any duct work around the cable, that it was lying on the ground, and he saw nothing broken out. There were two ducts, one on top of the other, and the cable was outside of those ducts. The crew completely excavated under the second duct, and there was nothing underneath it. Shelton stated that the arrangement was what he had encountered at 1440 Oakwood.

Michael Prosser testified that he was in the crew which did the digging at 1440 Oakwood. Prosser had never encountered duct work. According to Prosser, the crew probed beneath the second duct not only to make sure there were no other Bell structures, but also to watch out for the City's storm sewers. Prosser, like Shelton, testified that, after the duct work was exposed, it was in an "L" configuration, with two ducts side by side and one below.

Prosser stated that after they had hit the cable, he cleared away the earth from around the cable. Prosser did not see any clay, concrete or mortar debris. Prosser was able to see the cable. According to Prosser, the crew had been more careful in probing on this dig than on other digs because of the duct work. Prosser had no reason to believe there were any loose cables in the ground under the duct work. Prosser overheard some Bell employees "discussing how they were going to put [the cable] back together, and it seemed that they couldn't understand why it wasn't in a duct."

Prosser explained how they used the rod to determine whether there was anything buried. The rod is four feet long, and since they have to be in the hole to use it, they cannot push it straight in. Prosser stated that they started above the level at which they intended to auger and probed at different angles, working their way down. Prosser further stated that after they had found the second duct, *Prosser had no reason to believe there was an exposed cable underneath. The crew was "probing for another duct, not a cable;* \*\*\* if [they] were probing for a cable [they] might have spaded back farther." (Emphasis added.)

William Hall, a backhoe operator for the water division, testified that he dug the receiving pit at 1440 Oakwood. Hall explained how he dug to the bottom depth of the manhole, and then elongated the hole to accommodate the "hole hog." Hall dug the pit to a depth of $5\frac{1}{2}$ feet. When the crew encountered the duct work, shovels were used to expose the duct.

Hall also helped uncover the cable after it was damaged. Hall did not see any clay, cement or mortar debris. Hall described the duct configuration the same as Shelton and Prosser had. Three feet below grade was the deepest Hall had ever encountered a Bell line, before or after the incident. The cable in question was two feet deeper than that.

Bell recalled Nitschneider to testify in rebuttal. He stated that the inside dimension of a 3 by 3 duct is $3\frac{1}{2}$ inches. The exterior of it is about 14 inches. Although equipment sometimes settles, Nitschneider noted that it usually does not settle to a depth of five feet. That is an

unusual depth for Bell structures. Nitschneider knew of other structures laid at such depth, but none in Highland Park. Nitschneider explained that there are only one or two trunk lines within Highland Park and one of them is under Oakwood Avenue. Nitschneider did not know if a trunk line was hit, or if it was a subscriber cable.

After hearing the arguments of counsel, the court gave its decision. The court found all the factual testimony "to be largely credible." The court explained, "I don't know as a matter of fact whether that bottom cable was encased in a duct or not; but I am going to enter a finding in this case that it was not." The court gave the following reasons as the basis of this finding: the witnesses who were in the hole and who looked at the damage and said there was no duct visible; there was not any pulverized concrete or tile; there was no testimony regarding any repair to a damaged duct; and there was no testimony that there were other cables left unprotected.

The court further found that the cable was at a depth greater than that experienced by the City's employees. However, the discovery of the second duct gave them reason to investigate further. The crew investigated the area where the damage was but did not find anything. The court stated "[a] fourteen inch high duct encasing cables *** would have been impossible not to find; but even given the size of the cable without duct work, it is difficult to understand how they wouldn't have located it." The court initially stated that the City had a duty to make reasonable efforts to locate Bell's cable and to excavate in a reasonably safe manner so as to not damage the cable. The court also found that Bell had a duty to notify the City of the location of underground cables and, where there is something unusual at the site, to advise the excavator of that. Here, the number of ducts and the depth of the bottom cable were unusual.

The court concluded that both parties were negligent. Contrary to its initial description of the City's duty, the court found the City was negligent "in failing to locate the cable that it eventually struck, particularly in the circumstance where it knew or had reason to know there was something unusual," and it should have examined the particular depth to determine if there was a cable there. The court explained, "I think the city breached its duty in not locating the cable that was at that depth." The court found Bell breached its duty by not telling the excavator something about the unusual circumstances. The court found that Bell proved damages in the sum of $18,320.52, but because Bell was 40% negligent, it entered judgment for Bell in the amount of $10,992.31. The court also found that the trespass count was actually a negligence count since there was no intentional

damage. The court found that counts I and II were the same and, to avoid redundancy, entered judgment on count II only.

The City filed a post-trial motion, preserving the issues raised in this appeal. On May 15, 1990, the court denied the part of the post-trial motion which related to the finding of negligence. On June 15, 1990, the court, in a written order, entered judgment in favor of Bell and against the City on the City's counterclaim. The City timely appealed. Bell also filed a timely cross-appeal. We will address the City's appellate contentions first.

The City contends that the trial court's judgment was against the manifest weight of the evidence because the City's crew had no reason to know there was a cable in the location where they intended to auger and that the crew acted reasonably in probing the area, but not finding anything. The standard for reviewing the trial court's finding is whether the judgment was against the manifest weight of the evidence. (*De Kalb Bank v. Purdy* (1990), 205 Ill. App. 3d 62, 78.) A judgment is against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Rybak v. Provenzale* (1989), 181 Ill. App. 3d 884, 891.

The City, relying on *Penrod v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (1979), 68 Ill. App. 3d 75, 81, and *Barnes v. Rakow* (1979), 78 Ill. App. 3d 404, 407, refers to the maxim that one who in the course of his business or profession contracts to supply information for the guidance of others in their business may be liable for negligence if he fails to supply material information which could affect a business decision of the person receiving the information. According to the City, this maxim applies to the present case because, at the City's request, Bell provided information.

Bell argues that *Penrod* and *Barnes* are distinguishable because, in those cases, the defendant was in the business of supplying information, whereas plaintiff was in the business of supplying telephone service, not information.

We agree with Bell that the City's authorities are distinguishable because Bell here is not in the business of supplying information. In addition, *Penrod* and *Barnes* were cases in which the plaintiff sought damages from a defendant who supplied incorrect information. (See *Barnes*, 78 Ill. App. 3d at 407; *Penrod*, 68 Ill. App. 3d at 81-82; see also *Board of Education v. A, C & S, Inc.* (1989), 131 Ill. 2d 428, 453-54.) To determine whether the court correctly found the City liable, whether Bell was negligent in supplying information is not important; the issue is whether the City acted reasonably upon finding that the information provided it by Bell was faulty. Thus, we only shall be con-

cerned with the City's assertion that it acted reasonably, considering that it had no knowledge that there was another structure or cable beneath the second duct.

■ Bell argues that the City was required to make sure that there was no Bell equipment where the crew ran their auger. According to Bell, "[t]he fact that the City looked but did not find this large cable, or more probably the duct it was in does not relieve the city of negligence." Bell cites *Grass v. Hill* (1981), 94 Ill. App. 3d 709, 715, for the proposition that "one cannot look with an unseeing eye and not see that which he could have viewed by the proper exercise of his sight."

Bell's argument is flawed in several respects. First, the cable was not "large," but was only three inches in diameter and was not in a duct, contrary to Bell's assertions. Based upon information from Bell, defendant was to look for a duct not a cable. The crew found two ducts which arguably could have put them on notice that there was a third duct, which, in fact, there was. However, there was *nothing* that would have put defendant on notice that it should have been looking for a 2½- to 3-inch cable. Defendant was apprised of a duct system 36 inches in depth. The cable was 2½ to 3 inches in depth. The crew were using a probe that was five-sixteenths of an inch thick, and they could not push it straight in horizontally at the point where the auger was to go because the probe was too long for the width of the pit. The crew had to probe downward at varying angles.

In addition, the rule on which Bell relies is inappropriate in the present case. In *Grass*, the court applied the maxim to a driver who did not keep a proper lookout when passing other vehicles. (*Grass*, 94 Ill. App. 3d at 714-15.) Here, there was nothing to "see" but a wall of earth. The crew were fishing around to determine whether there was anything in that area. The crew's task was even more difficult than finding the proverbial needle in a haystack, because the crew did not even know if there was anything there. The unrebutted testimony showed that the City's crews had never encountered a Bell structure five feet below grade. Even if the presence of the second duct alerted the crew to the possibility of another structure, Prosser testified that they were looking for another duct, which is significantly larger than a bare cable, and that if they had known there was a cable in there somewhere, the crew would have probed deeper into the earth.

*DeYoung v. Alpha Construction Co.* (1989), 186 Ill. App. 3d 758, cited by Bell, also is distinguishable from the present case. In *De-Young*, the construction crew did not hand dig after they found one gas line but used a backhoe which "snagged" the second gas line. (*De-*

*Young*, 186 Ill. App. 3d at 764.) By contrast, in the present case the crew not only probed beneath the first duct, but also hand probed beneath the second duct. They did not "blithely disregard" the possibility that there was another structure beneath the second duct.

We must now determine whether it was against the manifest weight of the evidence for the trial court to conclude that the City was negligent by not finding the cable. The testimony showed that several times the crew probed around the area where they intended to auger. As previously noted, the probe was only five-sixteenths of an inch thick, and, as Shelton testified, they "could have missed it *** by probing over it, [or] under it." Prosser testified that the crew were more careful during this dig than they usually were, and if they had known they were probing for a cable, they "might have spaded back farther."

■■ ■ The trial court found that the City was negligent because the crew failed to find the cable, rather than determining whether the crew's search was reasonable. The mere fact that damage resulted does not raise the presumption that the City was negligent. (*Mort v. Walter* (1983), 98 Ill. 2d 391, 397.) The trial court needed to determine whether the City breached its duty, *i.e.*, whether it acted reasonably, not whether it found or did not find the cable. (See *Widlowski v. Durkee Foods* (1990), 138 Ill. 2d 369, 373.) The trial court specifically stated that the City was under a duty to find the buried cable, that the City breached the duty because it failed to find the cable, and finally that damage was proximately caused. The court applied an improper duty upon the City. The court should have determined the City had a duty to *act reasonably in attempting to locate* the buried cable, that it did or did not act reasonably in its attempts, and that damages were or were not proximately caused. We therefore vacate the court's finding as to negligence as to defendant and remand for further proceedings. We will review the remaining issues raised in this appeal as they are not moot.

The City's second appellate contention is that the indemnity agreement embodied in the ordinance, which granted Bell certain rights in the City, bars Bell from maintaining its cause of action. The City premises its argument on section 4 of the agreement, which states that Bell shall defend all suits brought against the City "by reason of or in connection with any damage to *** property as a result of any of the structures constructed by it under or by virtue of this ordinance," and further states that Bell "shall save and keep harmless the City from any and all damages, judgments, costs and expenses of every kind, that may arise by reason thereof."

■ The current state of the law is that indemnification provisions in construction contracts which relieve an entity of liability for its own negligence are void as against public policy. (*Dowling v. Otis Elevator Co.* (1989), 192 Ill. App. 3d 1064, 1070.) However, since the agreement here was entered into in 1965, it predates the enactment of the statute (Ill. Rev. Stat. 1989, ch. 29, par. 61). Therefore, the rule enunciated by our supreme court in *Westinghouse Electric Elevator Co. v. La Salle Monroe Building Corp.* (1946), 395 Ill. 429, applies. (*Cox v. Lumbermens Mutual Casualty Co.* (1982), 108 Ill. App. 3d 643, 646.) The *Westinghouse* court held that indemnity agreements are disfavored and must be strictly construed. (*Westinghouse*, 395 Ill. at 433-35.) When construing an indemnity clause, the court must consider the language and provisions as a whole. (*Owens v. Midwest Tank & Manufacturing Co.* (1989), 192 Ill. App. 3d 1039, 1042.) An indemnity agreement will not be construed as relieving one from liability for his own negligence absent an expression of that intention in clear and unequivocal terms. *Dowling*, 192 Ill. App. 3d at 1070-71.

■ Although the language of the indemnity clause appears to support the City's assertion, a reading of the entire section indicates that it was the intention of the parties that Bell agreed to defend all suits brought against the City by a third party based on Bell's violation of the conditions of the ordinance or as a result of damages caused by Bell's equipment. In particular, the requirement that Bell defend the City and the option that the City may assist in defending such claim at the direction of Bell or its attorneys would be rendered absurd under the City's interpretation. We will not read into the provision an implied agreement by Bell to waive any claims it might have against the City for damages negligently caused by it to Bell's property.

■ Furthermore, the purpose of indemnity agreements is at odds with the City's interpretation. Indemnity allows "one less culpable, although legally liable *to third persons*, [to] escape the payment of damages assessed against him by putting the ultimate loss upon the one principally responsible for the injury done." (Emphasis added.) (*John Griffiths & Son Co. v. National Fireproofing Co.* (1923), 310 Ill. 331, 339.) We therefore conclude that the trial court properly denied the City's request for declaratory relief.

We now turn to Bell's cross-appeal. Bell first contends that the trial court erred in not finding that the City committed an intentional trespass. According to Bell, the City committed an intentional trespass when the City's crew sent their "hole hog" across an area that was clearly marked by Bell's stakes and paint, and they damaged a

cable which was located where it had a right to be. In support of this argument, Bell cites *Illinois Bell Telephone Co. v. Charles Ind Co.* (1954), 3 Ill. App. 2d 258.

In *Ind*, the defendant was installing a storm sewer under the street. The city's surveying crew staked the parkway to indicate where the trench was to be dug, and the stakes indicated the depth of the excavation. While using an excavating machine, defendant began breaking the cement around the manhole. The defendant proceeded about 600 feet when the hoe came in contact with the plaintiff's cable, damaging it. Plaintiff claimed that the defendant was liable to it for a trespass. The appellate court found:

> "[D]efendant had a right to excavate where it did in constructing a storm sewer for its employer. Plaintiff, at that time, enjoyed a possessory or proprietary interest, granted it by the city in the portion of the street where defendant was excavating. The permit from the city gave defendant no right to interfere with this interest and when its excavating hoe struck and damaged plaintiff's cable defendant committed a trespass for which it became liable." *Ind*, 3 Ill. App. 2d at 278.

The City argues that Bell's reliance on *Ind* is misplaced because, in that case, the excavator did not ask Bell to locate its cables before the excavator began digging. The *Ind* court held that Bell did not have an affirmative duty to seek out the excavator and inform it of where its cables were located and the excavator had the duty to inform itself of the location of the Bell's property. In the present case, the City argues, Bell provided information at the City's request and part of Bell's business is to provide the information. In addition, Bell knew the City was about to begin excavating.

We agree with the City that *Ind* is factually distinguishable from the present case. The court's focus in *Ind* was the defendant's failure to notify the utility of the intent to excavate. (See *Ind*, 3 Ill. App. 2d at 275-77.) Here, the City called the JULIE system and requested information regarding the location of any underground structures, and the crew then hand dug and probed under the area marked "DUCT." Furthermore, we cannot read *Ind* as standing for the proposition that an unintentional intrusion is a trespass, in light of our supreme court's requirement of intent or negligence, unless the intrusion is caused by an ultrahazardous activity. *Dial v. City of O'Fallon* (1980), 81 Ill. 2d 548, 553, 555-57.

The other cases cited by Bell are distinguishable because, in those cases, the defendant knew there was a cable present, if not its precise location. (See *Wisconsin Telephone Co. v. Reynolds* (1958), 2 Wis. 2d

649, 87 N.W.2d 285; *Southwestern Bell Telephone Co. v. Frio Materials Co.* (Tex. Civ. App. 1978), 571 S.W.2d 376.) In the present case, the crew was alerted to the possibility that there might have been another *duct* present, but the crew had no way of knowing that there was a cable in the area at a depth at which Bell structures were unknown.

■ There are three general types of trespass: "(1) conduct intended to cause an intrusion on the plaintiff's premises; (2) negligent conduct that causes an intrusion; and (3) conduct that is ultrahazardous and causes an intrusion, so that liability is said to be strict or absolute." (*Dial*, 81 Ill. 2d at 553.) The trial court believed that Bell alleged the second type of trespass, which "is now governed by the general principles of negligence." (See *Dial*, 81 Ill. 2d at 553.) The trial court concluded that the trespass count was in fact a negligence count and, therefore, it was the same as count II.

■ Bell argues, however, that it was alleging an intentional trespass. For a person to be liable for an intentional trespass, there must be "a high degree of certainty that an intrusion of another's property will result from the act of the defendant." (*Dial*, 81 Ill. 2d at 555.) "In other words, a person must know with a high degree of certainty that the intrusion will naturally follow from his act before liability for trespass attaches." (*Dietz v. Illinois Bell Telephone Co.* (1987), 154 Ill. App. 3d 554, 559.) The evidence does not support the conclusion that the crew knew with a high degree of certainty that augering in that spot would cause an intrusion onto Bell's property. We therefore conclude that the trial court properly refused to enter judgment for Bell on its trespass count.

Because of our conclusion that the City did not commit an intentional trespass, we need not address Bell's second contention, that as a matter of law the City could not claim the defense of contributory negligence for the City's intentional trespass.

Bell finally contends the finding Bell was contributorily negligent was against the manifest weight of the evidence. (See *Apcon Corp. v. Dunn* (1990), 204 Ill. App. 3d 865, 869.) Bell does not dispute the trial court's apportionment of its share of comparative fault, but instead argues only that it was not negligent at all.

Because Bell is apparently confused about the facts adduced and the trial court's findings regarding its liability, we will briefly summarize them. The trial court found the excavating crew damaged a cable which was not in a duct. The cable was five feet below grade. Bell knew the City's crew were excavating to put in new water lines. Bell's employee only marked "DUCT" on the curb, but did not indi-

cate that there was also a loose cable in that area; nor did Bell hold a meeting with the crew to discuss the unusual circumstances present at the site. There was evidence that Bell knew of all the structures it had placed underground in Highland Park. The City's employees had never encountered one of Bell's structures at a depth of five feet. The deepest structure they had encountered had been three feet below grade, and most of Bell's structures were 18 inches down. These findings are supported by the evidence.

■■ A plaintiff has the duty to exercise reasonable care to avoid an injury. (*Beeler v. Chem-Lawn Corp.* (1989), 183 Ill. App. 3d 648, 654.) Consequently, contributory negligence is the lack of due care for one's own safety. (*Gruidl v. Schell* (1988), 166 Ill. App. 3d 276, 280.) The trial court found that, once Bell decided to give information to the excavator, Bell had a duty to notify the City of the location of the underground cable and to advise the excavator that there was something unusual at the site. The trial court found Bell failed to do these things and thus breached its duty. We agree with the trial court's conclusion that Bell did not exercise due care to avoid injury to its property, and, therefore, the finding of contributory negligence was not against the manifest weight of the evidence.

The judgment of the circuit court of Lake County is affirmed in part and remanded in part with directions that the trial court determine whether the City's actions under the circumstances constituted reasonable efforts to locate whatever, if anything, the City may reasonably have believed, at the time of the excavation, was present below the configured Bell ducts and to dig, bore, or excavate in a reasonably safe manner. The question of duty and breach thereof is not to be based upon knowledge *after the fact.*

Affirmed in part; remanded in part with directions.

BOWMAN, J., concurs.

PRESIDING JUSTICE REINHARD, dissenting:
I dissent from the majority's partial disposition of this cause on the ground that the trial court imposed an improper duty on the City of Highland Park (City), an issue not raised by any party below or on appeal. The failure to raise this issue is not surprising in light of the fact that the record simply does not support it.

The majority construes the trial court's comments as imposing an absolute duty on the City "to find the buried cable" rather than to take reasonable steps to attempt to locate the cable before digging. In

essence, the majority believes that the City was held to a standard of strict liability for failing to locate the cable. A careful review of the trial court's remarks below indicate that this is simply not the case.

During closing arguments, the trial court and the attorney for Illinois Bell discussed the nature of the duty owed by the City. The trial court clearly stated that "there isn't any strict liability here." In announcing its findings on this issue, however, the court stated that it could not see how the City failed to find the cable when it knew of other cables lying within a few inches or feet of it. The court then stated:

> "The city under these circumstances had a duty to take, make reasonable efforts to locate Illinois Bell's cable, and once having done that, dig or bore or excavate in a reasonably safe manner so as [not] to damage those cables."

The court proceeded to announce its finding on other issues presented. Finally, in the statement focused on by the majority, the court then *summarized* its findings, including the finding relating to the duty question:

> "The court having found that each side had a duty owing to the other, the court also finds that each side breached that duty to some extent, the city in failing to locate the cable that it eventually struck, *particularly in the circumstance where it knew or had reason to know there was something unusual,* and frankly I gave weight, some considerable weight to Mr. Anderson's argument that maybe the city's only obligation was, once having determined the depth at which it was going to drill the particular depth to see if there was a cable there.
>
> I think the city breached its duty in not locating the cable that was at that depth." (Emphasis added.)

Thus, the court concluded that if the City had made reasonable efforts to locate any cables at the depth of its planned excavation it would have discovered the cable. The court did *not* hold the City absolutely liable for locating the cable regardless of its location and depth.

If the majority believes that the City should not be held liable for its acts under the facts of this case, then it should address the question of whether the trial court's finding of negligence was against the manifest weight of the evidence. While I would not hold that the trial court's finding is against the manifest weight, the majority could have taken the contrary position on this point without unfairly slighting the trial court's careful consideration of the issue. Unfortunately, the majority has eschewed this direct approach in favor of one which is based upon comments taken out of context.

While I agree that the other issues raised in the appeal and in the cross-appeal are without merit, I dissent from the majority's opinion. I would affirm the judgment of the circuit court in its entirety.