ROBERT DeYOUNG *et al.*, Special Adm'rs of the Estate of Mildred De-Young, Deceased, *et al.*, Plaintiffs-Appellees, v. ALPHA CONSTRUCTION COMPANY, Defendant-Appellant and Cross–Plaintiff-Appellant (Northern Illinois Gas Company, Defendant and Cross–Defendant-Appellee).

First District (2nd Division)   No. 1—88—2976

Opinion filed July 25, 1989.

---

*Justice Egan participated in this decision before joining the sixth division.

French, Rogers, Kezelis & Kominiarek, P.C., of Chicago (Algimantas Kezelis, Russell P. Veldenz, and Terence R. Selby, of counsel), for appellant.

Thomas J. Shanahan, of Chicago, for appellee Northern Illinois Gas Company.

Corboy & Demetrio, P.C., of Chicago (Philip H. Corboy, Thomas A. Demetrio, and Bruce Robert Pfaff, of counsel), for other appellees.

JUSTICE SCARIANO delivered the opinion of the court:

In this action Virginia Cockerham sued for her injuries and the estate of Mildred DeYoung sued for her death and for property damage as a result of an explosion occurring at the DeYoung home. In turn, Alpha Construction Company (Alpha) filed a contribution claim against Northern Illinois Gas Company (NIGas). The jury returned a verdict for plaintiffs, awarding them $4,224,694.89, and found Alpha 100% liable. Alpha appeals, raising the following issues: (1) whether the jury verdict is against the manifest weight of the evidence; (2) whether the trial court erred in making certain evidentiary rulings; (3) whether Martin DeYoung's sobs during trial denied Alpha a fair trial; (4) whether NIGas' counsel's statements during closing argument denied Alpha a fair trial; and (5) whether the jury was properly instructed.

On March 13, 1986, Alpha, pursuant to its contract with the State of Illinois, was installing new water main lines along U.S. Route 30, also known as 14th Street, in Chicago Heights, Illinois. Route 30 is an east-west thoroughfare, and the DeYoung home, located at 204 West 14th Street, is on the south side of the highway. Prior to March 13, 1986, a NIGas employee had come to the site of the proposed trenches and located underground gas service lines that would cross the trench, marking the surface of the road with a yellow strip of paint. Many of the houses along Route 30 had two gas service lines: a "live" or new gas line and an old line which no longer had any gas running through it.

The Alpha crew began digging a trench one block east of the driveway at 204 West 14th Street and worked in a westerly direction, using a backhoe. As they approached the yellow strip in front of the De-Young house, but while still east of that line, they found a gas service line. In accordance with its contract with the State, Alpha was required to "hand dig" when digging in proximity to underground gas service lines; however, because frost and asphalt formed the surface of the road, they used a backhoe to "scratch" the surface, and then dug down to 2½ to 3 feet to locate the service line. After exposing the first line, the backhoe then "scratched" the surface 1½ to 3½ feet west of the first line, and, in so doing, snagged and bent another gas line. This second gas service line, which lay directly beneath the painted strip, was the live line to the DeYoung house. Alpha's foreman, Gerald Finnan, testified that the gas line was 18 to 20 inches below the surface of the road; however, a NIGas employee testified that the line was 30 to 32 inches deep.

Finnan immediately contacted the Alpha office at 7:35 a.m., giving the location as "Route 30 and Garden," an intersection one half block

or approximately 130 feet from the location of the bent service line. The Alpha office contacted NIGas at 7:37 a.m., while Alpha's crew continued digging the trench around the bent service line, breaking the water service line and the old gas service line.

The first NIGas crew to arrive at the scene had learned of the problem through the 7:37 a.m. phone call from Alpha, at which time they were told that it was a damaged main line instead of a damaged service line. They arrived at the scene at 7:48 a.m., but, because there was no one to direct them, they first walked to the north side of Route 30 and had to wait for heavy traffic to pass before crossing back to the south side of the street. Two NIGas crew members were walking toward the DeYoung house to turn off the gas and to warn its occupants when the house exploded. Mildred DeYoung was killed and her daughter, Virginia Cockerham, was injured in the explosion and subsequent fire.

The State Fire Marshal testified that it was his determination that the gas pipe had separated at a compression fitting approximately 30 inches from the DeYoungs' gas meter, that gas had consequently flowed out from the pipe underground and had seeped into the foundation of the house and ignited, and that the explosion occurred in the basement. The Fire Marshal also stated that a furnace or hot water heater may have been the source of ignition, although, in his opinion, it was most likely a sump pump; however, Martin DeYoung testified that there was no sump pump.

The jury returned a verdict for plaintiff, and, on Alpha's contribution claim against NIGas, assessed 100% of the damages against Alpha. The jury awarded $97,663 in property damage, $533,032 to Virginia Cockerham, and $3,600,000 to Mildred DeYoung's husband and children. The trial judge denied Alpha's post-trial motion, and this appeal followed.

Alpha first argues that the jury's verdict as to liability was against the manifest weight of the evidence and that the damage award is "highly excessive and must shock the conscience of the court."

Plaintiffs claimed that Alpha was negligent in:

(a) failing to "hand dig" in the vicinity of a marked, live gas line;

(b) failing to properly ascertain the location of the live gas service line before excavating with a backhoe;

(c) failing to require "hand digging" when excavating work was being done in proximity to a marked, live gas service line;

(d) striking and causing a leak in the live gas service line to the DeYoung house; and

(e) failing to warn the occupants of the DeYoung house of the existence of a gas leak prior to the explosion.

Alpha maintains that it acted reasonably in assuming that the first service line it found was live and in hand digging around that line, and asserts that it "cannot be considered negligent in failing to ascertain the location of the live gas line inasmuch as [it] had already found one line and the crew was looking for the other one with the best possible means available." It claims that the service line was 22 inches below the surface, that frost extended 18 inches beneath the four-inch black top, that it could not hand dig in the area of frost, and that it could not avoid hitting the service line; therefore, it asserts, its actions were not negligent. Alpha adds that after hitting the service line it acted reasonably in contacting NIGas and, it maintains, its instructions (from NIGas?) in a situation such as this were to turn the matter over to NIGas and do nothing further; thus, it claims, it acted properly in not warning the occupants of the house. It further argues that plaintiffs raised the issue of failure to warn against NIGas, the jury found in favor of NIGas, and thus "implicitly found that no one breached any duty to the plaintiffs on the failure to warn."

Alpha also contends that the trial court erred in directing a verdict in favor of plaintiff on the issue of proximate cause, arguing that plaintiffs failed to establish the source of ignition or how the gas entered the house. In granting the directed verdict, Alpha argues, the trial court improperly judged the credibility of witnesses and drew inferences in favor of plaintiffs. Alpha claims that there was evidence under which a jury could conclude that it was not negligent, but the court's ruling precluded the jury from making such a finding. It further asserts that the judge's ruling may have confused the jury, because they did consider proximate cause as to NIGas.

Plaintiffs respond that the jury's verdict was not against the manifest weight of the evidence, "manifest" meaning "clearly evident, clear, plain, or undisputable." (*Thomas v. Le Burkian* (1973), 10 Ill. App. 3d 742, 744, 295 N.E.2d 313.) They note that Alpha did not deny that it failed to hand dig in proximity to the live gas service line; it did not deny that it struck and damaged the gas service line; and it did not deny that it failed to warn the occupants of the house of the gas leak. Plaintiffs further maintain that the trial court properly found as a matter of law that Alpha's conduct was the proximate cause of their damages. They argue that the only dispute is over the source of ignition, a dispute the trial judge deemed "immaterial," stating "[t]here is no other possible proximate cause of the explosion if there is negligence." Plaintiffs assert that the danger was caused by the gas leak, not the

appliances in the basement; thus, Alpha's causing the leak was the proximate cause of the explosion.

■ We encounter no obstacle in holding that the verdict of the jury was not against the manifest weight of the evidence. There is no dispute that gas escaping from the snagged and bent service line is what caused the explosion, regardless of the source of ignition; nor is there any question but that it was Alpha that was responsible for snagging and bending that line. The issue in this case is whether Alpha was negligent in hitting the service line and whether it, as well as NIGas, was negligent in failing to prevent the explosion of the DeYoung house and in failing to warn its occupants. In directing a verdict on proximate cause, the trial judge in no way precluded the jury from finding that Alpha was not liable, because he left the question of negligence for the jury to decide, and there is ample evidence to support the jury's verdict that Alpha was indeed negligent. Alpha did not hand dig as required and it blithely disregarded the fact that although it had found a gas line east of the yellow strip in front of the DeYoung house, there was a strong probability that another line lay under the strip. Moreover, Alpha made no attempt to notify the DeYoungs that their service line had been damaged. With regard to Alpha's claim for contribution against NIGas, we note that NIGas was not given a proper address and no one from Alpha directed NIGas to the location of the snagged and bent line; instead, NIGas was forced to guess where the impact had occurred. Here again, there was evidence to support the jury's conclusion that Alpha was responsible for the additional yet unnecessary time it took for NIGas to find the service line.

■ Defendant next argues that the jury's award of $4,224,695 "is against the manifest weight of the evidence"; however, in reviewing a jury award the test is whether the verdict is excessive, that is, "whether the total amount of the verdict falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience." *King v. City of Chicago* (1978), 66 Ill. App. 3d 356, 359, 384 N.E.2d 22.

■ Defendant claims that the court erred in asking the jury during *voir dire* whether they would be willing to award a verdict "in the millions." It asserts that this was an "attempt to indoctrinate the jury or elicit a pledge from them." Plaintiffs correctly respond that the trial judge has discretion in determining what questions to pose to the jury and that it is proper to inquire whether potential jurors have fixed ideas about awards of specific sums of money. *Kinsey v. Kolber* (1982), 103 Ill. App. 3d 933, 431 N.E.2d 1316.

In *Kinsey*, the appellate court held that an inquiry whether venire

members would have trouble awarding $2 million if the law and evidence supported it was proper.

"Defendant urges that this remark supports the indoctrination purpose of the questions asked during *voir dire*. In advancing this argument defendant is asking this court to overrule *Scully v. Otis Elevator Co.* (1971), 2 Ill. App. 3d 185, 275 N.E.2d 905, *Jines v. Greyhound Corp.* (1964), 46 Ill. App. 2d 364, 197 N.E.2d 58, *rev'd on other grounds* (1965), 33 Ill. 2d 83, 210 N.E.2d 562, and *Murphy v. Lindahl* (1960), 24 Ill. App. 2d 461, 165 N.E.2d 340, all cases where the court held that questions concerning a specific verdict amount tended to uncover jurors who might have bias or prejudice against large verdicts." (103 Ill. App. 3d at 946.)

In *Scully*, the court held that questions designed to expose any latent prejudice of jurors against large verdicts were proper. *Scully v. Otis Elevator Co.* (1971), 2 Ill. App. 3d 185, 198, 275 N.E.2d 905.

■ Defendant also complains that the jury's verdict is a result of bias or prejudice and reflects a lack of deliberation. It notes that the jury began deliberations at 12:45 p.m. and returned a verdict by 2:45 p.m. of the same day. The jury awarded $97,663 for property damage; defendant argues, however, that the parties stipulated to property damage of $92,663 plus a $3,000 claim for Martin DeYoung's car. Defendant contends that the jury erred in awarding $2,000 more "than what everyone agreed would be the correct amount." Defendant also claims that the jury erred in awarding Virginia Cockerham $200,000 more than she requested for pain and suffering, and that, given the deceased's age, 75 years old, the $3,600,000 awarded to the 10 DeYoung children and Martin DeYoung for loss of her society is "totally irrational and puts the entire judicial system at risk." It maintains that the award of damages to each of the children is improper, because only two of them testified and thus there was no evidence that the other children suffered a loss.

In denying defendant's post-trial motion, the trial judge stated:

"[The jurors] were very careful and deliberate in their attention to the offerings of evidence, to the remarks of counsel, to the rules of the court, and to all the goings-on in the trial.

\* \* \*

I think they made an excellent effort to try to obey all the orders of this court, to follow the rules of this court and to really immerse themselves into their office of jurors, to really absorb what was going on. I am asked to substitute my judgment for theirs.

* * *

I'm no better than those twelve. I can't put a value on this case better than they. If I were to grant a new trial on damages only, what would I be doing? Would I be saying that it's possible that you can get a better group of twelve? I don't know. Is it possible to get a worse group of twelve? I don't know. But we had those twelve, and they certainly satisfied me, they convinced me that they were responsive to the evidence and that's all I have to be aware of. If I am convinced as I am that these twelve people were, in fact, responsive to the evidence and their efforts ruled [*sic*] in that verdict even though it be in the millions then who am I to set that verdict aside, why am I better than twelve of them, I am not."

With regard to the property damage claim, plaintiffs note that there was evidence that a driveway, previously installed at a cost of $1,300, and a tool shed costing $700 were destroyed in the explosion, and that neither of these items was included in the stipulation. Therefore, plaintiffs contend, the evidence supported the jury's award of $97,663.

Plaintiffs emphasize that Virginia Cockerham requested $300,000 "as a minimum" for her noneconomic damages; thus the jury's award of $500,000 for this element of damages was not more than she requested. They also maintain that the $500,000 award is supported by the evidence. There was testimony that as a result of the explosion, Virginia was thrown 75 feet out of her home and into a neighbor's yard and that the whole left side of her body was bruised and that it ached, debris was embedded in her left hand, three teeth were fractured and her mouth, lips and chin required stitches. Virginia and her father moved in with Virginia's brother and sister-in-law after the explosion, and there was testimony that Virginia did not sleep at night, that occasionally she would burst out crying and "look lost," that she did not want to leave the house, that she is nervous and had been diagnosed as suffering from post-traumatic stress disorder. She was treated for three months by a clinical psychologist, who testified that Virginia's condition has improved, but that she is not cured.

On the wrongful death claim, plaintiffs assert that there was evidence regarding the closeness of the DeYoung family, especially between Mildred and Martin DeYoung, her husband of 57 years. There was also testimony on the effect Mildred's death has had on Martin. Plaintiffs also contend that it was unnecessary for each child to testify to his or her loss, because the law presumes that each lineal next of kin has suffered some substantial pecuniary loss as a result of a death

(*Flynn v. Vancil* (1968), 41 Ill. 2d 236, 242 N.E.2d 237), and they argue that the damage aware "represents fair and reasonable compensation for the losses suffered by [Mildred's] husband and ten children."

The award of damages is a matter for the jury's determination (*Dooley v. Darling* (1975), 26 Ill. App. 3d 342, 358, 324 N.E.2d 684), and a reviewing court will not substitute its judgment for that of the jury as to the sum to be awarded (*Baird v. Chicago, Burlington & Quincy R.R.* (1976), 63 Ill. 2d 463, 472-73, 349 N.E.2d 413) unless the verdict shocks the judicial conscience. (*Northern Trust Co. v. County of Cook* (1985), 135 Ill. App. 3d 329, 334, 481 N.E.2d 957.) Here, the award is large; however, there are also a large number of survivors—indeed, an uncommon number—and we cannot agree with defendant's argument that Mildred DeYoung's advanced age for some obscure reason diminishes the loss her survivors experience. Accordingly, based on the evidence in the case, we hold that the verdict is not so "unreasonable as to require the conclusion that the jury acted from passion or prejudice." *Dooley*, 26 Ill. App. 3d at 358.

■ Defendant next argues that the trial court erred in making certain evidentiary rulings. First, it claims that the Fire Marshal should not have been allowed to express his opinions as to the origin of the explosion, because plaintiffs had not disclosed him as an expert pursuant to Supreme Court Rule 220, which provides that "the identity of an expert who is retained to render an opinion at trial on behalf of a party must be disclosed by that party." 107 Ill. 2d R. 220 (b).

Plaintiffs respond that Rule 220 "obliges litigants to disclose the identity and opinions only of those witnesses who are engaged for the purpose of giving an expert opinion at trial" (*Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 234, 529 N.E.2d 525); that the Fire Marshal formulated his opinions as part of his job duties; that he prepared an official report which was subpoenaed months before trial; and that his report discloses the opinions elicited at trial. They contend that Alpha was well aware of the Fire Marshal's identity and that both Alpha and the plaintiffs disclosed the Fire Marshal as witness in discovery responses.

Plaintiffs were not required to disclose the Fire Marshal as an expert, because he was not "engaged for the purpose of giving an expert opinion at trial." (*Tzystuck*, 124 Ill. 2d at 234.) Further, Alpha cannot claim surprise or prejudice, since the Fire Marshal's opinions were included in his report, which was subpoenaed by Alpha well in advance of trial, and his trial testimony was based on that report.

■ Defendant also claims that the trial court erred in allowing plaintiff to admit "a purported standard concerning the use of hand

digging around gas and water services lines and mains." The exhibit at issue, an excerpt from 83 Illinois Administrative Code, section 265.45, provides as follows:

" 'Handdigging'—The method employed to excavate for the exposure of existing underground facilities shall be limited to the use of hand-operated tools such as shovels, spades, picks, bars, etc., or automatically-powered hand devices designed to be held in the hand of the operator when in use. The use of automatically-powered hand tools such as air or electric-powered drills, spades, breakers, etc., shall be restricted to the breaking of existing pavement or other surface material that cannot be practically removed with common hand tools; or to the removal of frozen soil or other frozen material where the removal cannot be reasonably accomplished by the use of common hand tools." (83 Ill. Adm. Code §265.45 (1985).)

Alpha claims that this section of the Illinois Administrative Code is applicable only to public utilities and therefore does not apply to it.

Plaintiffs respond that the exhibit was used as a definition rather than a standard and that Fred Marshall, the general manager of Alpha, stated that he considered it a reasonable definition of hand digging. The parties agree that under its contract with the State, Alpha was required to hand dig; the dispute is over what "hand digging" means. In admitting the exhibit, the trial judge stated that he would consider admitting any other definitions of hand digging "which may be applicable to any aspect of this case"; however, Alpha did not present any definitions of its own. Moreover, the judge ruled that Alpha was entitled to bring to the jury's attention the fact that the definition is limited to public utilities. The jury was entitled to an explanation of what "hand digging" involved, and Alpha was given ample opportunity to present its own explanation or definition and did not take advantage of it; therefore, Alpha was not prejudiced by the admission of this definition into evidence and the trial judge's ruling was correct.

█ Defendant next claims that a photograph which NIGas contends showed the true depth of the service line was improperly admitted. Alpha maintains that the photo is misleading, as it portrays a trench excavated from the site of the accident towards the center of Route 30, where the road becomes higher. A NIGas employee testified that he stood in the Alpha ditch and measured when the picture was taken; however, when asked whether he was standing in a ditch created after the occurrence and one that runs north toward the main line, the witness replied, "That could very well be." The jury heard the

witness testify that he believed he was standing in the Alpha ditch when the picture was taken, as well as his statement that he may not have been in the Alpha ditch, and it was for the jury to decide which statement was the more accurate one.

■ Alpha's final charge regarding the court's evidentiary rulings is that it was error for Virginia Cockerham to testify regarding the changes in her father's sleeping habits, as well as for Virginia's sister-in-law to testify that Virginia has lowered self-esteem and that she needed to see a psychiatrist, because neither witness is an expert. Plaintiffs respond that the witnesses were testifying to their personal observations and not to their opinions on an ultimate fact. Sleeping habits and self-esteem are not subjects requiring expert testimony; thus, the testimony at issue was properly allowed.

■ Defendant next argues that Martin DeYoung's emotional outburst denied it a fair trial. While testifying, Martin began crying and the court immediately called for a recess to allow him to compose himself. During the testimony of his son, Martin once again cried. The trial judge denied defendant's motion for a mistrial, stating "there was not an extended period of sobbing nor was there uncontrolled type sobbing. It was a sob[,] [i]t was quickly brought under control." The judge found that the sob had not been planned or staged. *Maciukevicius v. Zagorski* (1988), 172 Ill. App. 3d 303, 526 N.E.2d 569, supports plaintiffs' contention that tears are not grounds for a new trial. In that case, the plaintiff began to cry as she described the damage to her car. The appellate court upheld the trial court's denial of a motion for a mistrial, stating:

> "We disagreed that the plaintiff, who may have been flustered and nervous, broke down or lost such control that the jury would have been unduly influenced or sympathetic. *** In any event, the trial judge was in the best position to assess whether defendants' objection had any merit. Moreover, emotional outbursts by parties to personal injury cases are not grounds for mistrial where such conduct is neither intentional nor simulated and its effect is not so prejudicial as to have indisputably affected the jury's ability to try the case fairly." (172 Ill. App. 3d at 308.)

(See also *Biel v. Wolff* (1970), 126 Ill. App. 2d 209, 217, 261 N.E.2d 474 (defendant crying).) Here, there is no indication in the record that Martin's show of emotion was disruptive; moreover, the judge found that the sob was not intentional and that it did not prejudice the jury. Absent apparent error, that decision will not be reversed (*Buckler v. Sinclair Refining Co.* (1966), 68 Ill. App. 2d 283, 295, 216 N.E.2d 14), and

in the instant case, we discern no error.

Defendant also claims that the jury was not properly instructed. Plaintiffs' instruction 24(a) included as damages for Virginia Cockerham "the pain and suffering experienced and reasonably certain to be experienced in the future as a result of the injuries." Defendant urges that there was no evidence that Virginia would continue to suffer physical injury problems in the future.

Plaintiffs reply that there was testimony that Virginia would probably need dental implants and that although she has improved, she is not cured of her post-traumatic stress disorder and that she still manifests symptoms of that disorder. Therefore, plaintiffs maintain, the instruction at issue was properly given.

Defendant also contends that plaintiffs' instruction 26(a) is argumentative and "an adversarial statement highlighting plaintiffs' case with partisan tones." The instruction modifies Illinois Pattern Jury Instructions, Civil, No. 31.04 (2d ed. 1971) (IPI Civil 2d) by adding the following: "pecuniary loss includes loss of society." It also informs the jury that they may consider evidence concerning the marital relationship between Mildred and Martin, the relationship between Mildred and each of her children, as well as "[w]hat instruction, moral training, and superintendence of education the decedent might reasonably have been expected to give [her children] had [she] lived."

Plaintiffs respond that pursuant to *Elliott v. Willis* (1982), 92 Ill. 2d 530, 442 N.E.2d 163, pecuniary loss does include loss of society. They further assert that their instruction has been approved by the IPI committee for the third edition of instructions, and that instructions which have been approved by the committee, although not yet approved by the supreme court, are "sufficient to give to the jury" (*Soderquist v. St. Charles Mall Associates, Ltd.* (1988), 177 Ill. App. 3d 207, 222, 523 N.E.2d 903) so long as the instruction is supported by the evidence. They claim that evidence was presented as to the relationship Mildred DeYoung had with each of her children and her husband, and that, therefore, the judge did not abuse his discretion in giving the modified instruction.

Defendant also claims that the trial court erred in refusing its instruction No. 6 ( IPI Civil 2d No. 5.01), which informs the jury as to what they may infer from the failure of a party to produce a witness. It maintains that the eight children who did not testify are not entitled to any damages for loss of society, because they have not proved such loss, and that the jury was allowed to speculate that all the children suffered the same damages. In reply, plaintiffs rely on *Lorenz v. Air Illinois, Inc.* (1988), 168 Ill. App. 3d 1060, 522 N.E.2d 1352. In that

case, defendant tendered IPI Civil 2d No. 5.01 because decedent's children did not testify at trial. The appellate court upheld the trial court's refusal to give that instruction, holding "there has been no showing that decedent's children were not equally available to defendant. More importantly, given that their relationship with decedent was fully described by plaintiff, no prejudice resulted from the children's absence at trial." (168 Ill. App. 3d at 1068.) Plaintiffs contend that their relationship with their mother was "fully described," and the trial judge "would probably have precluded all family members from testifying as cumulative."

Finally, defendant claims that the trial court erred in giving plaintiffs' instruction No. 8 (IPI Civil 2d No. 3.01), informing the jury that the credibility of a witness "may be attacked by introducing evidence that on some former occasion the witness made a statement or acted in a manner inconsistent with [his] testimony." Plaintiffs contend that the instruction was proper, because Finnan, Alpha's foreman, was impeached by conduct inconsistent with his testimony (regarding continued digging of the trench after hitting the gas line) and Young, an Alpha employee, was impeached with prior inconsistent statements from his deposition. They correctly contend that the trial judge has discretion in giving IPI Civil 2d No. 3.01 (*Martin v. Kralis Poultry Co.* (1973), 12 Ill. App. 3d 453, 464, 297 N.E.2d 610) and that there was no abuse of discretion here.

■■■ The evidence supported the instructions given; thus, we find no error in the trial judge's instructing the jury that it could consider Virginia Cockerham's future pain and suffering, the deceased's relationship with her family members, and that a witness may be impeached by prior inconsistent statements. Further, the trial court properly refused to inform the jury that it could draw inferences from the failure of some of the DeYoung children to testify.

■■■ Alpha also claims that it was denied a fair trial by NIGas' counsel's statements during closing argument that he was proud of his client's employees and the way that they reacted to the emergency. Although these remarks are improper, they did not "so materially prejudice" Alpha that it was denied a fair trial. *Funk v. Venture Stores, Inc.* (1981), 94 Ill. App. 3d 115, 418 N.E.2d 498.

For all of the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

HARTMAN and DiVITO, JJ., concur.