RICHARD WAKEFORD, Plaintiff-Appellant, v. RODEHOUSE RESTAURANTS OF MISSOURI, INC., Defendant-Appellee.

Fifth District   No. 5—90—0461

Opinion filed December 26, 1991.—Rehearing denied January 31, 1992.

Richard Shaikewitz and Samuel A. Mormino, Jr., both of Wiseman, Shaikewitz, McGivern, Wahl, Flavin & Hesi, P.C., of Alton, for appellant.

James E. Gorman and Curtis L. Blood, both of Reed, Armstrong, Gorman, Coffey, Thomson, Gilbert & Mudge, P.C., of Edwardsville, for appellee.

JUSTICE CHAPMAN delivered the opinion of the court:

Rodehouse Restaurants of Missouri, Inc. (hereinafter referred to as Ramada Inn), is a corporation doing business in Alton, Illinois, under the name of Ramada Inn. Richard Wakeford and his wife Dawn went to the Ramada Inn in Alton at approximately 8:30 p.m. on November 2, 1984. The couple met with friends, ate and had a few drinks. Near midnight Richard and Dawn left the Ramada Inn through the main dining room doors and walked to their car, which was parked next to the exit. As Richard Wakeford unlocked the passenger door he heard footsteps, looked up and saw someone coming toward him with a gun. The man shot twice, Wakeford swung at him, and he fired a third shot. The gunman ran away and has never been identified.

Wakeford discovered that he had been shot in the temple, ear, chest, and left hand. He was taken to Alton Memorial Hospital, where he remained for three days while he was treated for the gunshot wound to his chest. Wakeford was then transferred to DePaul Hospital in St. Louis, Missouri, where he was treated by a specialist in hand surgery.

Wakeford filed suit against the Ramada Inn alleging negligent and willful and wanton misconduct in that the defendant failed to provide sufficient lighting at the exit of the restaurant and the parking area for the security of the patrons, and failed to provide security guards or any means for protecting the security of the patrons. The jury returned a verdict for the defendant, and plaintiff appealed, claiming error in four areas: (1) a violation of Illinois Supreme Court Rule 220 (134 Ill. 2d R. 220); (2) the injection of insurance into the case; (3) *ex parte* communication with a witness; and (4) granting of defendant's motion *in limine* which barred testimony of a witness.

The first issue concerns the admissibility of the testimony of police officer Lahlien. During opening statements, counsel for Ramada Inn stated that he intended to call to the stand certain Alton police-

men who would testify as to whether or not Ramada Inn should have had a security guard. Wakeford's attorney objected and moved for a mistrial because the policemen whom defendant referred to had not been disclosed as experts. Defense counsel advised the court that one of the witnesses he intended to call was an investigating officer of the shooting. The trial court denied Wakeford's motion for a mistrial and refused to limit the witnesses' testimony.

Defendant took the evidence deposition of Officer Lahlien during trial. The court and counsel reviewed the deposition outside the presence of the jury. Wakeford renewed his earlier objection that Lahlien's testimony concerning whether or not the area surrounding Ramada Inn was a "high-crime" area and whether or not the Ramada Inn needed a security guard was expert testimony and subject to the disclosure requirements of Illinois Supreme Court Rule 220. (134 Ill. 2d R. 220.) Over Wakeford's objection the deposition was read to the jury.

Lahlien testified that he has lived in Alton all his life and is familiar with the Ramada Inn area because he patrolled the area as a police officer and has been in the Ramada Inn "on a few occasions." Lahlien assisted in the investigation of the Wakeford incident and was present when a detective interviewed Richard Wakeford. During his examination by defense counsel, Lahlien was asked, "[D]o you consider the Ramada Inn to be in a high crime area as of 1984 [sic]?" Lahlien responded, "I don't consider it a high crime area." On further inquiry Lahlien stated that in his opinion the Ramada Inn did not need a security officer at the time of the incident. Lahlien testified as to the bases for his opinion:

"I have perused the three-by-five index card system whereby we list crimes attributed to geographic areas in Alton. The Ramada Inn does not have a background of high level incidence of crimes against persons. Personal recollection, general feel of Ramada Inn is not that of what I would say would be negativism."

Wakeford argues that the trial court erred in allowing the testimony of police officer Lahlien as an expert without prior disclosure.

Illinois Supreme Court Rule 220 provides in pertinent part:

"An expert is a person who, because of education, training or experience, possesses knowledge of a specialized nature beyond that of the average person on a factual matter material to a claim or defense in pending litigation and who may be expected to render an opinion within his expertise at trial. He may be an employee of a party, a party, or an independent contractor.

*  *  *

>In order to insure fair and equitable preparation for trial by all parties the identity of an expert who is retained to render an opinion at trial on behalf of a party must be disclosed by that party ***." (134 Ill. 2d R. 220.)

Wakeford agrees that Lahlien was an investigating officer in this case and could testify concerning his investigation of the crime and the facts surrounding this case. Wakeford argues, however, that because Lahlien's testimony went far beyond the scope of his investigation and involved matters based on specialized knowledge, he should have been disclosed as an expert under Rule 220. Ramada Inn concedes that Lahlien testified as an expert in this case but argues that disclosure of Lahlien was not required.

In the case of *Tzystuck v. Chicago Transit Authority* (1988), 124 Ill. 2d 226, 529 N.E.2d 525, the supreme court held that a treating physician is not an expert within the meaning of Illinois Supreme Court Rule 220:

>"Although the defendants argue that 'retained' in Rules 220(b)(1) and (c) refers broadly to witnesses who are 'requested' to give an opinion within their field of expertise, we consider it obliges litigants to disclose the identity and opinions only of those witnesses who are engaged for the purpose of giving an expert opinion at trial. It may be said that the connection between a medical expert who is 'retained to render [a medical] opinion at trial' and the party to the suit may be litigation-related, rather than treatment-related. Treating physicians, on the other hand, typically are not 'retained to render an opinion at trial' but are consulted, whether or not litigation is pending or contemplated, to treat a patient's physical or mental problem. While treating physicians may give opinions at trial, those opinions are developed in the course of treating the patient and are completely apart from the litigation. Such an opinion is not formed in anticipation of a trial, but is simply the product of a physician's observations while treating the patient, which coincidentally may have value as evidence at a trial. In this respect, the opinions of treating physicians are similar to those of occurrence witnesses who testify, not because they were retained in the expectation they might develop and give a particular opinion on a disputed issue at trial, but because they witnessed or participated in the transactions or events that are part of the subject matter of the litigation." (*Tzystuck*, 124 Ill. 2d at 234-35, 529 N.E.2d at 528-29.)

The background of *Tzystuck* may be of some significance. *Tzystuck* actually involved the consolidated cases of *Tzystuck v. Chicago Transport Authority* and *Diminskis v. Chicago Transit Authority*, and the supreme court had two Rule 220 questions before it. First, from *Tzystuck*:

> "Whether the plaintiff is responsible for the payment of fees to the plaintiff's treating physician pursuant to Supreme Court Rule 220 when a physician is subpoenaed by the defendant for the taking of his discovery deposition and the plaintiff intends to call this physician to testify at trial." (124 Ill. 2d at 232, 529 N.E.2d at 527.)

Procedurally, the trial court had ruled that the plaintiff was responsible; the appellate court denied plaintiff's petition for leave to appeal, but the supreme court allowed it.

The second question, from *Diminskis*:

> "[W]hether a treating physician who will testify to a medical opinion at trial is an expert witness within the meaning of Rule 220(b)(1)." (124 Ill. 2d at 232, 529 N.E.2d at 528.)

The record in *Diminskis* revealed that, while plaintiff had not specifically named Dr. Von Roenn as an expert who would testify at trial, he had (1) named him as a treating physician, (2) indicated that treating physicians would testify at trial, and (3) provided defendant with Dr. Von Roenn's records. In addition, defendant had deposed Dr. Von Roenn.

The supreme court addressed the question from *Diminskis* first and decided that treating doctors did not have to be disclosed under Rule 220 because they were not experts under the rule. The court's disposition of the question from *Diminskis* allowed it to dispose of the question from *Tzystuck* in a one-page statement that the plaintiff need not pay the deposition costs of a treating doctor.

The answer to the question of whether the supreme court chose the order in which it would address the issues in order to ease its way into the answer in *Tzystuck* is as unknowable as the answer to the question of whether Shakespeare was truly the author of all the sonnets credited to him. While there can be no doubt that the order in which matters are viewed can have an effect:

> "It was not so much that His Birth cast a shadow on His Life, and thus led to His Death; it was rather that the Cross was first, and cast its shadow backward to His Birth." (F. Sheen, *The Life of Christ* 25 (1954).)

The answer to the importance of the chosen order need not unduly concern us. What must concern us, however, are the bases for the su-

preme court's answer to the *Diminskis* question, and it may well be that the cost factor decided in *Tzystuck* was one of the unstated concerns involved in *Diminskis*.

Turning, however, from what may have been left unstated to what was stated, we find that there are both factual and policy bases for the decision. On the factual front we note that the defendant was well aware of the likelihood of Dr. Von Roenn testifying, and that it had been furnished his records a year before trial. While the supreme court did not hold that these facts influenced its result, it may be worthy of note that they were mentioned twice in the relatively brief opinion. A fact that was mentioned only once, but was noted as an observation in the appellate court opinion as well, is that Dr. Von Roenn's testimony was based upon his observations and experiences with the plaintiff "rather than on outside materials." (*Tzystuck*, 124 Ill. 2d at 238, 529 N.E.2d at 530.) We emphasize the foregoing language for two reasons: First, it is a factor that is singularly absent in this case; second, and more importantly, it is indicative of what we would call the transition basis of the court's holding that knowledge of the incident was gained through nonlitigation-oriented means. We view this as a transition basis because it is actually an evidentiary point in establishing the first true policy basis of *Diminskis'* holding, which is that the treating doctor is not under the control of the proferring party in the same way that a retained expert is deemed to be. (*Schaffner v. Chicago & North Western Transportation Co.* (1989), 129 Ill. 2d 1, 541 N.E.2d 643; *Dugan v. Weber* (1988), 175 Ill. App. 3d 1088, 530 N.E.2d 1007.) To state the obvious, the result in *Diminskis* was reached not because Dr. Von Roenn did not possess all the attributes of an expert set forth in Rule 220(a) (or any other definition of the term) but because the supreme court had other reasons for not placing him into that category.

The first of those stated, as we have just indicated, was the lack of control over a treating doctor. The lack-of-control policy basis was premised on the practical concern that:

> "To construe Rule 220 to include treating physicians would unrealistically and unfairly oblige litigants to ensure that witnesses beyond their control comply with the extensive discovery obligations of subsection (c) at the risk of having a witness disqualified for failure to comply." *Tzystuck*, 124 Ill. 2d at 237, 529 N.E.2d at 530.

The second policy basis articulated in *Diminskis* was that parties could adequately discern the possibility of a treating doctor testifying by using other discovery tools, specifically Illinois Supreme Court

Rule 201(b)(1) (134 Ill. 2d R. 201(b)(1)). The danger of a surprise expert would be minimized because the identity of treating doctors would be routinely disclosed under that rule.

The court's analysis of its second policy basis is accurate as far as it goes; clearly the identity of treating doctors will become known during the ordinary course of discovery, and their opinions can be discovered through depositions. The difficulty is that they are then free to develop new and undisclosed opinions near the eve of, or even during trial. (See *Wilson v. Chicago Transit Authority* (1988), 126 Ill. 2d 171, 533 N.E.2d 894.) This ability to formulate and reveal surprise opinions is not limited to plaintiffs; any defendant doctor in a medical malpractice case is obviously a treating physician and may therefore be perfectly capable of disclosing a new opinion formed during the course of the trial. *Fawcett v. Reinertsen* (1989), 131 Ill. 2d 380, 546 N.E.2d 558; see also *Moore v. Roberts* (1991), 217 Ill. App. 3d 446, 577 N.E.2d 538; *cf. Karr v. Noel* (1991), 212 Ill. App. 3d 575, 571 N.E.2d 271.

The final reason given by the court was the fact that Rule 220 was based in part upon Federal Rule of Civil Procedure 26(b)(4) (Fed. R. Civ. P. 26(b)(4)) and its conclusion that Rule 26(b)(4) did not apply to treating doctors.

Of the three policy reasons given by the court, we feel that the first, the inability to control the nonretained expert so as to obtain compliance with Rule 220(c), is the most significant. There is by no means complete agreement on this point. (See *Cochran v. Great Atlantic & Pacific Tea Co.* (1990), 203 Ill. App. 3d 935, 561 N.E.2d 229.) Other districts of the appellate court have also stressed different bases from *Tzystuck* in their analyses.

The first post-*Tzystuck* case was *Smith v. Central Illinois Public Service Co.* (1988), 176 Ill. App. 3d 482, 531 N.E.2d 51. *Smith* was a Structural Work Act case in which the defendant architect firm's project manager, an engineer, was allowed to give his opinion that a gallery system was designed in the safest manner and complied with all professional standards. The engineer, Mr. Loftus, had been deposed by the plaintiff, but the plaintiff argued that since Loftus had not been disclosed as an expert, he had not been examined in the area of his expertise. The court likened the situation in *Smith* to the treating-doctor situation in *Tzystuck* and held that Loftus was intimately involved in the subject matter of the litigation and need not have been disclosed as an expert witness pursuant to Rule 220(b)(1). 176 Ill. App. 3d at 494-95, 531 N.E.2d at 59.

*Smith* focused on two of the bases contained in *Tzystuck*, the information was gained through nonlitigation-oriented means (the expert was the project engineer) and there should have been no surprise about his opinion since his name was known and his deposition had been taken. In our judgment the *Smith* analysis ignored the most significant basis of *Tzystuck*, the control aspect; the expert was an employee of one of the defendants and could have easily been required to comply with the strictures of Rule 220(c).

*Smith* was followed in *Hill v. Ben Franklin Savings & Loan Association* (1988), 177 Ill. App. 3d 51, 531 N.E.2d 1089, which involved an opinion given by a party, again a person who could have been required to comply with Rule 220(c), and in *Voyles v. Sanford* (1989), 183 Ill. App. 3d 833, 539 N.E.2d 801, in which the expert was a former employee. There are several other cases which comment upon *Tzystuck* and extend it beyond the treating-doctor area. See *First National Bank v. Village of Mount Prospect* (1990), 197 Ill. App. 3d 855, 557 N.E.2d 1257; *Beiermann v. Edwards* (1990), 193 Ill. App. 3d 968, 550 N.E.2d 587; *Forest Preserve District v. Brookwood Land Venture* (1990), 199 Ill. App. 3d 973, 557 N.E.2d 980; *Department of Transportation ex rel. People v. Central Stone Co.* (1990), 200 Ill. App. 3d 841, 558 N.E.2d 742; *Coleman v. Central Illinois Public Service Co.* (1990), 207 Ill. App. 3d 96, 565 N.E.2d 274; *McGuckin v. Chicago Union Station* (1989), 191 Ill. App. 3d 982, 548 N.E.2d 461; *DeYoung v. Alpha Construction Co.* (1989), 186 Ill. App. 3d 758, 542 N.E.2d 859.

The questions which need to be asked: what is gained by these extensions and/or are they really necessary? We submit that there is little, if anything, to be gained because it is unnecessary to extend the treating-doctor exception as fully as has been done. It may well be that the supreme court's concern about parties' inability to comply with Rule 220(c) requirements with nonretained experts can be alleviated while still requiring the disclosure of the identity of those experts.

We conclude that the preferable solution, one that keeps faith with both the holding and the primary basis of *Tzystuck* and also provides for the policy of disclosure that the supreme court implemented with its adoption of Supreme Court Rule 220, is to require disclosure of the identity of all experts.

If all parties are required to disclose the identity of all experts that they may call, whether they be treating doctors, fire marshals, former employees or the like, then the opposing party is alerted to the fact that these witnesses may be giving expert opinions in the

case. (See *Marshall v. Osborn* (1991), 213 Ill. App. 3d 134, 571 N.E.2d 492 (court held that the better practice is to disclose all potential experts since the decision to bar them rests with the judge).) It takes little effort to disclose the expert, and the potential impact on the opposing party of an unknown expert can be devastating. While *Smith* said "the fact that he testified is not a surprise; rather that he gave an expert opinion surprised plaintiff" (*Smith*, 176 Ill. App. 3d at 494-95, 531 N.E.2d at 59), the fact is that Rule 220 was promulgated to prevent surprise *opinions*. Experts who do not give opinions are like Santas that do not give gifts; impressive in the finery of their qualifications, but useless in their ability to persuade.

The next step is obviously the discovery of the expert's opinion. If Rule 220 were followed, the party disclosing the identity would be required to furnish a report or to provide answers to interrogatories. This could be a practical problem when the expert is not retained. The retained expert is presumably much more willing to cooperate in the preparation of the reports that are a part of the litigation process. It has been held that retained experts are sufficiently under the control of the retaining party to warrant giving Illinois Pattern Jury Instruction, Civil No. 5.01 (Illinois Pattern Jury Instructions, Civil, No. 5.01 (2d ed. 1971)) (IPI) when they fail to appear. (*Dugan v. Weber* (1988), 175 Ill. App. 3d 1088, 530 N.E.2d 1007; *Schaffner*, 129 Ill. 2d 1, 541 N.E.2d 643.) We note, parenthetically, that the fear of an IPI Civil 2d No. 5.01 instruction may be one of the reasons for the reluctance to disclose experts' names, but that issue is not before us. Nevertheless, while a retained expert may be perfectly willing (for an appropriate fee) to prepare a report, a nonretained expert such as the fire marshal (*Deyoung*, 186 Ill. App. 3d 758, 542 N.E.2d 859), the former employee (*Voyles*, 183 Ill. App. 3d 833, 539 N.E.2d 801), or the treating doctor (*Tzystuck*, 124 Ill. 2d 226, 529 N.E.2d 525) may be much less willing to do so. Therefore, the appropriate way to proceed with nonretained experts is to allow the opposing party to proceed with whatever discovery it deems appropriate once disclosure is made.

What is the effect of requiring this procedure? First, it achieves the early disclosure of all those (both retained and nonretained) who are to be called to render an expert opinion at trial. Second, because only those disclosed as retained experts under Rule 220 could call for a future IPI Civil 2d No. 5.01 instruction, a possible source of the reluctance to disclose would be eliminated. Third, the supreme court's concern over the incurring of costs would be alleviated because the opposing party need only conduct discovery of the experts disclosed and then only to the extent it deemed necessary.

One problem that is not covered by this procedure, but which is an important one, is the possible change in an expert's opinion after initial discovery. Supreme Court Rule 220(c) requires automatic supplementation of expert opinions, but the supreme court has ruled that it does not cover the treating doctor (*Tzystuck*, 124 Ill. 2d at 237, 529 N.E.2d at 529-30), and presumably it would not cover the other non-retained experts either. The only feasible solution at this time is the use of supplementary discovery near the time of trial. While this is not as efficient as the automatic supplementation requirement of Rule 220(c), it must be remembered that the class of experts covered by this procedure is not the same as the retained expert covered by Rule 220. Therefore, the diligent use of supplementary discovery (coupled with an awareness by trial courts of the significance of a late change in an expert's opinion) will hopefully reduce the possibility of surprise in this area.

■ With regard to the facts in the instant case, we begin with the premise espoused in *Tzystuck* that treating physicians acquire their facts and opinions, not in anticipation of trial, but because they witnessed or participated in the transactions or events that are part of the subject matter of the litigation. (*Tzystuck*, 124 Ill. 2d at 234-35, 529 N.E.2d at 528.) Officer Lahlien was an investigating officer, and he first testified about his investigation of the incident itself which was done in the course of his duties as a police officer. Next, he testified that he formed an opinion as to the security of the Ramada Inn area based on the police department's records. Wakeford does not claim surprise concerning any of the information Lahlien used in his investigation of the Ramada Inn incident, but he does claim surprise as to the information contained in the crime-incident summaries, index cards or police records upon which Lahlien relied in giving his opinion as to security. Wakeford claims that the information had nothing to do with Lahlien's investigation, and that he was surprised when those materials were provided to Officer Lahlien to enable him to form an opinion about security.

Lahlien's connection with this case arose when he was called upon to investigate the criminal attack. The scope of his professional involvement with the case prior to being approached by defense counsel encompassed interviewing witnesses and investigating the crime. Although Lahlien, by the very nature of his job, had access to the police records and crime-incident summaries, but for the desire of defense counsel that Lahlien express an opinion at trial as to whether the Ramada Inn was in a high-crime area and needed a security guard, Lahlien would not have been required to form an opinion as to such. Lah-

lien was not a viewer or actor with regard to the questions concerning incidents of crime in the area and whether or not the Ramada Inn should have had a security guard. The questions posed of Lahlien clearly called for an opinion based on Lahlien's expertise rather than his observation and involvement of a specific incident. (See *Jenkins v. Whittaker Corp.* (9th Cir. 1986), 785 F.2d 720.) Because Lahlien's involvement in this case was more than that of an actor or viewer with respect to the occurrences that are part of the subject matter of the lawsuit (see 134 Ill. 2d R. 220(c)(4); *Baran v. Presbyterian University Hospital* (W.D. Pa. 1984), 102 F.R.D. 272, 39 Fed. R. Serv. 2d 582; *Keith v. VanDorn Plastic Machinery Co.* (E.D. Pa. 1980), 86 F.R.D. 458, 29 Fed. R. Serv. 2d 671), he was an expert witness within the meaning of Rule 220.

Supreme Court Rule 220 specifically provides that the failure to disclose an expert will result in the expert's testimony being barred. (134 Ill. 2d R. 220(b)(1).) The trial court erred in not barring the testimony of Officer Lahlien as to his opinion regarding the incidence of crime in the area and security at the Ramada Inn. Such testimony was expert testimony as contemplated by Rule 220, and defendant should have disclosed the witness pursuant to that rule.

■ Moving on to the second issue in this case, plaintiff contends that the trial court erred in allowing the defendant to cross-examine Wakeford as to whether Wakeford's medical bills had been paid by his own medical insurance. The defendant replies that it was plaintiff who initially injected insurance into the case during the direct examination of Dawn Wakeford, the plaintiff's spouse:

"Q. When your husband worked for Sawyer, do you know how much he made on a yearly basis?

A. He averaged between $22,000.00 and $23,000.00 a year salary plus fringes that included a vehicle, license, title, *insurance,* repairs for work, and he also was able to use that for personal use, as well as all supplies, ladders, tools, dropcloths, sandpaper, paint." (Emphasis added.)

Similarly, during the direct examination of Richard Wakeford the following colloquy occurred:

"Q. [H]ow much were you making in the last two or three years before you were hurt?

A. Roughly $22,000.00 to $23,000.00 was my average wage. I had a fringe package. Sawyer's [*sic*] gave me a vehicle to drive for work and for home, and personal use. They furnished all of my tools. I estimated that fringe package between $5,000.00 and $10,000.00."

On cross-examination Wakeford was asked and answered:

"Q. Whether [*sic*] you talked about losing the fringes, part of that was your insurance you had with Sawyer. You figured that in, did you not?

A. That's correct.

Q. Isn't it a fact that when this occurred, you were also covered by your wife's insurance at her place of work, and it in fact was a better insurance coverage than Sawyer?

A. That's correct. But as they insured me, they were the primary carrier.

Q. And then after that was dropped, you're now covered by your wife's policy?

A. Yes, sir. At a considerable fee for me."

Both of the Wakefords' references to insurance dealt with a fringe benefit that they claimed Richard had lost as a result of his inability to work. Under the circumstances, the defendant was entitled to inquire about any inconsistencies in their testimony about the loss of the fringe benefit of insurance. It was improper, however, for the defendant to elicit the collateral-source matter of Dawn's insurance coverage through her employer (*Biehler v. White Metal Rolling & Stamping Corp.* (1975), 30 Ill. App. 3d 435, 444, 333 N.E.2d 716, 723), and this should be avoided upon retrial.

The next issue on appeal is whether the trial court erred in refusing to bar the testimony of James Kincaide after defense counsel had an *ex parte* communication with him. Kincaide works for the Illinois Department of Vocational Rehabilitation. The Department was created "to provide for rehabilitation *** and other services to persons with one or more disabilities, their families and the community." (Ill. Rev. Stat. 1989, ch. 23, par. 3430.) "An Act in relation to rehabilitation of disabled persons" provides:

"The Department shall have *** the authority:

* * *

(g) to assure that the case and clinical records of patients in Department supervised facilities and persons receiving other services of the institutions of the Department *shall not be open to the general public*. Such case and clinical records and reports or the information contained therein shall be disclosed by the Director *only* to proper law enforcement officials, *individuals authorized by court*, the Illinois General Assembly or any committee or commission thereof, and to such other persons and for such reasons as the Director shall designate by rule or regu-

lation." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 23, par. 3444.

Kincaide testified that he is a rehabilitation counselor, with a master's degree in Guidance and Counseling. He works in the Department of Rehabilitation Services, which works with the disabled to help them obtain gainful employment. Services provided by the Department include surgery, physical restoration, and speech therapy. Persons must demonstrate financial need before they are eligible to obtain the services of the Department. Kincaide testified that he was assigned Richard Wakeford's case file but soon thereafter closed the file after speaking with the Wakefords and determining that their income exceeded the income of those determined to be in financial need.

Outside the presence of the jury, plaintiff objected to the defendant calling James Kincaide to testify. An examination of Kincaide was conducted outside the jurors' presence whereupon it was disclosed that defense counsel contacted the witness a week prior to trial. When asked whether defense counsel inquired as to Wakeford's ability to work, Kincaide testified, "I believe he did." Defense counsel admits that he discussed the closure of Wakeford's file with Kincaide, and that he may have discussed Wakeford's ability to work. Kincaide testified that defense counsel asked "what our financial criteria was ***. [W]e discussed case closure." The trial court overruled plaintiff's objection to Kincaide testifying.

Plaintiff argues that Kincaide is akin to the treating physician in *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 499 N.E.2d 952. He contends that it was improper for defendant to contact Kincaide, and that the court erred in not barring him from testifying. *Petrillo v. Syntex Laboratories, Inc.* held that defense counsel cannot confer with plaintiff's treating physician other than by court-authorized discovery methods. The *Petrillo* court held that such *ex parte* contact is not authorized by the rules, noting that the structure and supervision authority inherent in the discovery rules serve to protect various societal interests such as the confidentiality and fiduciary nature of the physician-patient relationship. Where an *ex parte* communication has taken place between defense counsel and a plaintiff's treating physician, sanctions may be imposed upon the defendant, including barring the testimony of the plaintiff's treating physician. (*Karsten v. McCray* (1987), 157 Ill. App. 3d 1, 509 N.E.2d 1376.) *Petrillo* has been extended to nurses who assist doctors in treating a patient because such a rule advances the public policies of confidentiality in the doctor-patient relationship. *Roberson v. Liu* (1990), 198 Ill. App. 3d 332, 555 N.E.2d 999.

Defendant argues that assuming Kincaide is a health care professional, the record does not demonstrate that defendant used confidential information which Kincaide divulged and, therefore, no prejudice was shown. Although there may be no evidence that Kincaide actually disclosed any of the plaintiff's confidences, there can be no question that he breached his fiduciary duty to the plaintiff. What matters is the threat or potential harm to the treating physician-patient relationship. (*Karsten*, 157 Ill. App. 3d at 14, 509 N.E.2d at 1384; *Mondelli v. Checker Taxi Co.* (1990), 197 Ill. App. 3d 258, 554 N.E.2d 266.)

"[The] situation *** is a one that plaintiffs' lawyers face all too frequently. The plaintiff's doctor has huddled with defense counsel, but it [is unknown] whether privileged information was disclosed. The doctor has thrown his or her allegiance to the defense, but it cannot be known whether improper influences were at work. The testimony itself violates no rule of evidence or privilege, and yet, the prejudice to the plaintiff's case is devastating. ***

Confidentiality, once breached, cannot be restored." (Corboy, *Ex Parte Contacts Between Plaintiff's Physician & Defense Attorneys: Protecting the Patient-Litigant's Right to a Fair Trial*, 21 Loy. U. Chi. L.J. 1001, 1011 (1990).)

As stated in a recent article discussing prohibited *ex parte* contacts:

"The *Petrillo* doctrine attempts to preserve the physician-patient relationship during the litigation process by regulating the method, not the substance, of what is discoverable. The policies underlying the rule encompass and *extend beyond* the credited purposes of the privilege.

In order to give the doctrine its due, therefore, mere contact must be the standard against which a *Petrillo* violation is measured. The bright-line test is a natural extension and consistent interpretation of *Petrillo's* intent and provides certainty that any litigant could appreciate. Exceptions, if any exist, should be limited." Redden & Bower, *Qualifications to the Bar of Ex Parte Contacts with Physicians*, 79 Ill. B.J. 442, 448 (Sept. 1991).

■ The question we are confronted with is whether public policy so favors the confidential relationship between a patient and his therapist that *ex parte* communications with a person having access to those confidences are prohibited. Before we answer this question, however, defendant argues that we must determine if in fact Kincaide is a therapist.

Kincaide holds a master's degree in guidance and counseling and refers to himself as a rehabilitation counselor. Defendant argues that Kincaide is not a therapist and is not a health care professional in any sense. Kincaide testified that he has worked for the Department of Rehabilitation Services for 15 years. During direct examination Kincaide was asked and answered the following questions:

"Q. Would you tell the jury the type of services that are offered by that department and the type person they're offered to?

A. Well, basically we work with the disabled and try to provide services to help them get back into some type of gainful employment.

Q. How would you break down the services that are offered?

A. Really, we can justify most any service if it is justifiable that it will enhance somebody's employability.

Q. What are some of those things then you would do?

A. Surgery, physical restoration, speech therapy. I'm trying to think of all of them. There is [sic] quite a few.

Q. Do you offer placement services?

A. Yes."

While Kincaide described the services offered by the Department, he was not specifically asked nor did he describe what his particular role with the Department is. Kincaide testified that he worked with Wakeford's file, but it is unclear from the record just what services Kincaide provided Wakeford. Without more we cannot determine if Kincaide is a therapist or is otherwise employed as a recognized health care professional. Nonetheless, it is clear that in his employment Kincaide has access to Wakeford's medical file and hence to confidential information regarding Wakeford's treatment.

Kincaide describes himself as a rehabilitation counselor; he is employed in an office that provides health care, including surgery, physical therapy, and speech therapy; pursuant to his employment Kincaide works directly with the patient's files. Regardless of Kincaide's job title and whether he is himself a health care professional, we find that *Petrillo* applies in this case to Kincaide because he possesses and has access to the confidences of the patient and his treating physician. If we were not to apply *Petrillo*, we would do an injustice to the public policies of confidentiality and fiduciary duty in the physician-patient relationship.

Wakeford argues that the trial court erred in not barring Kincaide from testifying. The imposition of sanctions for failure to comply with

discovery rules and orders is within the discretion of the trial court and should not be disturbed absent an abuse of discretion. (*Ritter v. Rush-Presbyterian-St. Luke's Medical Center* (1988), 177 Ill. App. 3d 313, 322, 532 N.E.2d 327, 332-33.) We hold that defense counsel's conduct with Kincaide was not in keeping with the policy of *Petrillo*. However, as this cause is reversed and remanded, we need not reach the issue of what sanction is appropriate in this circumstance. Such determination is left to the discretion of the trial court.

Finally, we are asked whether the trial court erred in refusing to allow the plaintiff's expert, David Whipple, to testify as to the number of crimes and incidents committed in the area surrounding the Ramada Inn.

David Whipple, a former Alton police officer, worked for the Alton police department from 1970 through 1984. Throughout the years he has worked as a patrol officer, a narcotics agent, a detective, and as a teacher in the area of security and law enforcement. After leaving the Alton police department, Whipple and a fellow police officer established a private security guard agency.

Whipple was hired by the plaintiff to examine Madison County police and sheriff's records to determine how much crime or police activity had taken place in the vicinity of Ramada Inn for a three-year period prior to the incident at bar. Plaintiff argues that Whipple was hired to provide evidence of prior crimes and incidents that occurred at or near the premises, thereby establishing that the defendant breached its duty to exercise reasonable care in failing to provide adequate security. Prior to trial defendant filed a motion *in limine* to prevent Whipple from testifying about prior *police activity*. The court granted defendant's motion *in limine*, finding:

> "He can't give the number, but he can give the percentages, if he has them.
>
> * * *
>
> If he wants to talk about police activity and twelve percent of this police activity consists of felonies, that's fine. And then so many of the felonies reported, percentages consists of forcible felonies, that is likewise fine. He's not going to say there is [*sic*] a thousand crimes there when there is [*sic*] just a thousand items of police activity.
>
> * * *
>
> You're going to have to show some serious crimes, and then you could establish some kind of pattern of something maybe related to crimes against a person like automobile thefts and

that type of thing. *** I don't think police activity in and of itself is sufficient to establish any type of crime pattern."

During direct examination Whipple testified that from 1979 through 1984, there were approximately 60 incidents at the Ramada Inn that were reported to the Alton police department. Of these 60 incidents, approximately one-third were felonies. Whipple identified several Alton "high-crime" areas, including Lincoln Gardens, a housing project, which is roughly 500 feet from the Ramada Inn. Whipple concluded that the Ramada Inn could have had a uniformed security guard on duty the night of the incident to prevent the shooting.

Defense counsel extensively cross-examined Whipple about the types of activities included in his report. Whipple testified that criminal activity included incidents involving thefts of hubcaps, fights, flat tires, and someone in the dining room throwing glasses. On redirect, in an attempt to rehabilitate the witness, plaintiff asked, "What numbers did you get for what years when you counted those crimes?" Defense counsel objected, and plaintiff made an offer of proof that Whipple would testify as to the amount of police activity that occurred in the area in 1982, 1983, and 1984, and that his reason for seeking that testimony was because of defendant's extensive cross-examination of Whipple concerning the nature of the incidents. The trial court sustained defendant's objection.

■ Plaintiff argues that Whipple should have been permitted to testify as to the amount of police activity in the area because it formed the basis for his opinion that Ramada Inn is in a high-crime area and that the Wakeford incident was reasonably foreseeable. We find that the trial court did not err in prohibiting Whipple from testifying as to the number of crimes and incidents in the area. The trial court has discretion to prohibit admission of evidence which is otherwise admissible but whose probative value is outweighed by the danger of prejudice or confusion. (*Deerhake v. DuQuoin State Fair Association, Inc.* (1989), 185 Ill. App. 3d 374, 380, 541 N.E.2d 719, 722.) It is clear from the record that Whipple was not precluded from testifying as to the percentages of certain types of crimes. The court merely precluded plaintiff from mischaracterizing police activities as crimes. We do not find that the trial court erred in refusing to allow Whipple to testify as to the amount of police activity in the area.

Finally, plaintiff argues that the trial court erred in prohibiting Whipple from testifying that (1) an hour prior to the shooting a man was seen by a hotel employee trying to enter the window of room 150; (2) a guest tried to check in to room 150 but it was occupied; and (3) Whipple believed that whoever broke into room 150 was Wake-

ford's attacker. Plaintiff argues that the incident involving room 150 is relevant to the issue of notice and foreseeability.

A review of the record shows that Whipple testified that approximately one hour prior to the shooting a hotel employee observed a man trying to enter or push on a window to room 150. Whipple further testified that a patron of the hotel tried to check in to room 150 but found that it was occupied. Defendant objected to this line of questioning, and plaintiff made the following offer of proof:

> "[I]f permitted to go on, I would ask the witness whether he has an opinion as to that person [*sic*] might have been the perpetrator. His answer would have been yes. I would ask him the reason why. He would say that [that person] *** could have been leaving and attempting to rob Wakeford and take his car."

The trial court sustained the defendant's objection to the testimony respecting the assignment of room 150 to a hotel patron and occupation of the room. The court also prohibited Whipple from testifying as to his opinion that the person lurking was Wakeford's attacker. The court stated, "The incident about somebody lurking around is all right. But the room incident is so conjectural and speculative that it is stricken."

■ There must be some basis in the record to justify relying upon the testimony of a witness who possesses special skill or knowledge, so that it cannot be said that the testimony is merely guess or conjecture. (*Continental Illinois National Bank & Trust Co. v. Eastern Illinois Water Co.* (1975), 31 Ill. App. 3d 148, 160, 334 N.E.2d 96, 106.) Where an expert's testimony is incompetent and inadmissible because of its speculative nature, the trial court is correct in striking it. (See *In re Union Drainage District Number One* (1976), 39 Ill. App. 3d 862, 350 N.E.2d 865.) In the instant case, the trial court did not err in striking Whipple's testimony.

For the foregoing reasons, this court reverses and remands this cause to the circuit court of Madison County.

Reversed and remanded.

RARICK and WELCH, JJ., concur.